**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALICE MAYALL, as parent and guardian of minor H.C., on behalf of H.C. and all others similarly situated,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>USA WATER POLO, INC.,<br>*Defendant-Appellee.* | No. 16-56389<br><br>D.C. No.<br>8:15-cv-00171-<br>AG-KES<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted March 9, 2018
Pasadena, California

Filed November 28, 2018

Before: William A. Fletcher, Paul J. Watford,
and John B. Owens, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## California Law / Negligence

The panel reversed the district court's dismissal for failure to state a claim of a putative class action against USA Water Polo, alleging negligence, breach of voluntary undertaking, and gross negligence, concerning USA Water Polo's failure to implement concussion-management and return-to-play protocols for its youth water polo league.

The plaintiff alleged that her minor daughter, H.C., was returned to play as a goalie in a water polo tournament after being hit in the face by the ball and while manifesting concussion symptoms, received additional hits to the head, and as a result she suffered severely debilitating post-concussion syndrome.

To prevail in a negligence claim under California law, a plaintiff must plead the existence of a duty, a breach of that duty, and damages proximately caused by the breach. California Civil Code § 1714(a)'s "primary assumption of risk" doctrine provides that an entity does not owe a duty of care where "conditions or conduct that otherwise might be viewed as dangerous . . . are an integral part of the sport itself." *Knight v. Jewett*, 834 P.2d 696, 708 (Cal. 1992).

Plaintiff alleged that USA Water Polo was liable for injuries suffered when H.C. was hit in the head *again*, after she returned to play. The panel held that under California

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

law, secondary head injuries such as those suffered by H.C. were not "inherent in the sport" of water polo, and therefore USA Water Polo owed a duty of care to H.C. The panel rejected USA Water Polo's contention that it fulfilled its duty of care to H.C. with the existence of its "Rules Governing Coaches' Conduct" that was applicable to all of its teams.

Concerning the voluntary undertaking claim, plaintiff alleged that by failing to establish a concussion-management and return-to-play protocol for its youth water polo league, USA Water Polo failed to exercise reasonable care in the performance of its undertaking, resulting in H.C.'s concussion. The panel held that USA Water Polo increased the risk of secondary concussions to players who improperly returned to pay, a risk that USA Water Polo could eliminate through the implementation of concussion-management protocols already used by its national team. The panel further held that the failure of USA Water Polo to promulgate safety rules that would have protected H.C. was sufficient to support a voluntary undertaking claim.

Concerning its gross negligence claim, plaintiff alleged that USA Water Polo repeatedly ignored the known risk of secondary injuries, and repeatedly ignored requests that it implement a concussion-management and return-to-play protocol. The panel held that plaintiff's allegations, taken as true, demonstrated that USA Water Polo was well-aware of the severe risk of repeat concussions and of the need to implement a policy to remove players from play after suffering a head injury, and its inaction amounted to gross negligence under California law.

The panel concluded that the second amended complaint pleaded sufficient facts to support claims upon which relief

can be granted under California law for negligence, voluntary undertaking, and gross negligence.

## COUNSEL

Elizabeth Anne Fegan (argued), Hagens Berman Sobol Shapiro LLP, Chicago, Illinois; Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; for Plaintiff-Appellant.

Steven Jeff Renick (argued) and Jeffrey M. Lenkov, Manning & Kass Ellrod Ramirez Trester LLP, Los Angeles, California, for Defendant-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

Alice Mayall brought this putative class action against USA Water Polo as a representative of her minor daughter, alleging negligence, breach of voluntary undertaking, and gross negligence. The gravamen of Mayall's complaint is that USA Water Polo failed to implement concussion-management and return-to-play protocols for its youth water polo league. The Second Amended Complaint ("SAC") alleges that H.C., Mayall's daughter, was returned to play as a goalie in a youth water polo tournament after being hit in the face by the ball and while manifesting concussion symptoms. After she was returned to play, H.C. received additional hits to the head. As a result, she suffered from severely debilitating post-concussion syndrome. The district court dismissed the suit under Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim under California law.

We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand.

## I. Background

According to the SAC, H.C. was a "healthy, high-achieving, straight-A honors student and multi-sport athlete" who played for a water polo team under the governance of USA Water Polo. On February 15, 2014, when H.C. was either fifteen or sixteen, she was injured while playing goalie during an annual three-day "WinterFest" tournament organized and managed by USA Water Polo. H.C. "was hit hard in the face by a shot which led to a concussion." The game continued while "H.C. swam to the side of the goal and spoke with her coach . . . ." The coach, who was "lacking any concussion management training, qualifications, and education from USA Water Polo," asked "a couple questions." Even though she was "dazed," H.C. was returned to play for the remainder of the game. Later that day, H.C. played in more games and took more shots to the head, exacerbating her initial injury. The additional shots to the head were witnessed by the referee and by H.C.'s coach. H.C. was never evaluated by a medical professional during the tournament.

Two days later, H.C. suffered from headaches, sleepiness, and fatigue so severe that she was unable to attend school. For the next two weeks, H.C. experienced excessive sleeping, dizziness, intolerance to movement, extreme sensitivity to light, headaches, decreased appetite, and nausea. On March 4, 2014, Mayall took H.C. to a doctor, who diagnosed

her with post-concussion syndrome. On March 12, the doctor recommended a consultation with a neurologist. The neurologist confirmed the diagnosis.

H.C.'s symptoms persisted, and she was unable to return to school. H.C. took part in a "home-and-hospital instructional program" for the remainder of the 2013–2014 school year. H.C.'s academic ability was severely degraded. Her neuropsychologist noted that H.C. demonstrated "a deficit in her ability to hold information in her mind or complete tasks, and was functioning in a low-average range in memory and controlled attention." At the time of filing the SAC, H.C. continued to suffer from persistent post-concussion syndrome, characterized by excessive sleeping, chronic headaches, and limited physical stamina. Because of her symptoms, H.C. was unable to attend public school.

The SAC alleges that USA Water Polo is the " 'national governing body for the sport of water polo in the United States' " (quoting from USA Water Polo bylaws). "USA Water Polo is the sanctioning authority for more than 500 Member Clubs and more than 400 tournaments are conducted nationwide each year[.]" "USA Water Polo requires all players and participants to follow the policies, bylaws, rules of conduct, and regulations it has enacted." USA Water Polo's "Policies and Guidelines" state that USA Water Polo is "committed to creating a healthy and safe environment for all of our members." "[A]s acknowledged by USA Water Polo's CEO, Christopher Ramsey, USA Water Polo's corporate documents support the obligation that USA Water Polo is responsible for health and safety issues."

The SAC alleges that scientific studies show that there are substantial neurological risks in allowing athletes to return to

play before they have completely recovered from a concussion. One study cited by the SAC concludes that "returning an athlete to participation before complete recovery may greatly increase the risk of lingering, long-term, or even catastrophic neurologic sequelae." The SAC alleges, "As of 2002, consensus had been reached in the medical and scientific community for the cornerstones of the management and treatment of concussions." Reflecting this consensus, an international group of experts has agreed on post-concussion "return-to-play" protocols, the most recent of which is the "Zurich II Protocol," published in 2012. With respect to children and adolescents , the Zurich II Protocol provides:

> Because of the different physiological response and longer recovery after concussion and specific risks (eg, diffuse cerebral swelling) related to head impact during childhood and adolescence, a more conservative RTP [return-to-play] approach is recommended. It is appropriate to extend the amount of time of asymptomatic rest and/or length of the graded exertion in children and adolescents. It is not appropriate for a child or adolescent athlete with concussion to RTP on the same day as the injury, regardless of the level of athletic performance.

In 2011, three years prior to H.C.'s injury, USA Water Polo had developed a detailed "USA Water Polo Concussion Policy" for athletic trainers for USA Water Polo's national team. However, USA Water Polo did not require, or even recommend, that its Concussion Policy be followed by other water polo teams under its governance. The SAC alleges it

ignored repeated requests—even pleas—to implement a concussion protocol for its other teams.

Between 2011 and 2014, USA Water Polo received numerous emails reporting incidents in which young athletes suffered concussions and requesting implementation of a concussion policy for all water polo events. For example, in August 2011, officials at Fullerton College "alerted USA Water Polo about a player who was injured during a USA Water Polo-sanctioned game" and "requested any USA Water Polo concussion guidelines[.]" USA Water Polo's Director of Club and Member Programs, Claudia Dodson, acknowledged that there was no concussion policy applicable to the college. Professor Peter Snyder, the Head Swim Coach at Fullerton, then sent another email regarding the incident, encouraging USA Water Polo to implement a concussion-management and return-to-play protocol. After USA Water Polo responded by sending Snyder the national team's policy, Snyder pointed out that the policy "was only applicable to an extremely small portion of the USA Water Polo membership," and "implored" USA Water Polo to implement a protocol for all levels of play. But USA Water Polo took no action.

The SAC alleges that at the time of H.C.'s injury in 2014 and during the class period, USA Water Polo had no concussion-management policy or return-to-play protocol for its youth water polo teams. However, USA Water Polo did have "Rules Governing Conduct" applicable to all coaches, referees and athletes, not limited to those associated with the national team. "[B]uried in the fine print" of the Rules was a provision stating that USA Water Polo coaches were "expected to demonstrate good sportsmanship," including "avoiding . . . encouraging or permitting an athlete to return

to play pre-maturely following a serious injury (e.g., a concussion) and without the clearance of a medical professional."

The SAC alleges three causes of action under California law: negligence; breach of voluntary undertaking; and gross negligence. The district court granted a motion to dismiss under Rule 12(b)(6), holding that (1) the SAC fails to allege a duty owed to H.C. by USA Water Polo and therefore fails to allege actionable negligence; (2) the SAC insufficiently alleges that a task or duty was "specifically" undertaken by USA Water Polo, and that USA Water Polo had increased the risk of harm to H.C.; and (3) the SAC fails to allege gross negligence because it fails to allege a duty owed to H.C. by USA Water Polo, and it fails to allege an "extreme departure from ordinary standards of conduct."

We reverse and remand for further proceedings.

## II. Standard of Review

"We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Fields v. Twitter, Inc.*, 881 F.3d 739, 743 (9th Cir. 2018) (quotation omitted).

## III. Discussion

### A. Negligence

To prevail in a negligence claim under California law, a plaintiff must plead the existence of a duty, a breach of that

duty, and damages proximately caused by the breach. *See Beacon Residential Cmty. Ass'n. v. Skidmore, Owings & Merrill LLP*, 327 P.3d 850, 853 (Cal. 2014) (quoting *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc*, 463 P.2d 770, 774 (Cal. 1970)); *see also Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 463 (Cal. Ct. App. 2003).

The SAC alleges that USA Water Polo had a "duty to Plaintiff . . . to prohibit same day return to play after a concussion, head blow or the exhibition of concussion symptoms, as well as to prohibit premature return to play before a player has fully recovered from a concussion, is asymptomatic after proceeding through a stepwise return to play protocol, and is cleared by a physician." The SAC further alleges that USA Water Polo breached that duty "by failing to implement any policies, rules or regulations" to prohibit such "return to play." Finally, the SAC alleges that H.C. was harmed by USA Water Polo's breach of the alleged duty.

### 1. "Primary Assumption of Risk" Doctrine

California Civil Code § 1714(a) provides, "Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person [.]" Section 1714(a) establishes a "general duty of each person to exercise, in his or her activities, reasonable care for the safety of others." *Cabral v. Ralphs Grocery Co.*, 248 P.3d 1170, 1172 (Cal. 2011). Liability under § 1714(a) is the general rule. "[I]n the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.' " *Id.* at 1174 (quoting *Rowland v. Christian*, 443 P.2d 561, 564

(Cal. 1968). Public policy considerations include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Rowland*, 443 P.2d at 564.

Under California's "primary assumption of risk" doctrine, a person or entity does not owe a duty of care under § 1714(a) where "conditions or conduct that otherwise might be viewed as dangerous . . . are an integral part of the sport itself." *Knight v. Jewett*, 834 P.2d 696, 708 (Cal. 1992). The general rule under § 1714(a) with respect to sports is that liability exists if a defendant acts (or fails to act) in a way that increases the risk beyond that "inherent in the sport." "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." *Id.*

Mayall does not argue that USA Water Polo is liable under § 1714(a) for the injury incurred when H.C. was hit in the head the first time. Rather, she argues that USA Water Polo is liable for injuries suffered when H.C. was hit in the head *again*, after she was returned to play. USA Water Polo argues that such secondary head injuries are inherent in the sport of water polo and that it is therefore not liable under § 1714(a). The question before us is thus whether, under

California law, secondary head injuries such as those suffered by H.C. are "inherent in the sport" of water polo. The district court held that they are inherent, and that USA Water Polo therefore did not owe a duty of care to H.C. We disagree, based on a review of California case law.

*Knight* is the principal California case. Plaintiff was injured by another player during an informal game of touch football. The California Supreme Court denied recovery under its primary assumption of risk doctrine and offered a number of examples to illustrate the concept of "inherent in the sport":

> [A]lthough moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. . . . [A]lthough a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its tow ropes in a safe, working condition so as not to expose skiers to an increased risk of harm. . . . [T]he latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant. . . . [I]n a game of baseball a player generally cannot recover if he or she is hit and injured by a carelessly thrown ball[.] . . . [I]n a game of basketball, recovery is not permitted for an injury caused by a carelessly extended elbow.

*Id.*

The Court in *Knight* contrasted its example of a carelessly thrown ball with the facts in *Ratcliff v. San Diego Baseball Club*, 81 P.2d 625 (Cal. Ct. App. 1938), where a California Court of Appeal had held the owner of a baseball stadium liable for injuries suffered from a thrown bat. In approving the result reached in that case, the Court referred to the "duty of the stadium owner to provide a reasonably safe stadium with regard to the relatively common (but particularly dangerous) hazard of a thrown bat." *Id.* at 709. The Court faulted the stadium owner "for its failure to provide the patron 'protection from flying bats, at least in the area where the greatest danger exists and where such an occurrence is reasonably to be expected.' " *Id.* (quoting *Ratcliff*, 81 P.2d at 626).

The reasoning and result in *Ratcliff* support Mayall. Injury from a flying bat at a baseball game and from returning to play in a water polo game after an initial head injury can be minimized or eliminated. The court in *Ratcliff* acknowledged that the stadium owner could not have protected all patrons from flying bats, but held that the owner at least had a duty where "the greatest danger exists" and was "reasonably to be expected." *Ratcliff*, 81 P.2d at 626. Similarly, while a water polo coach or sponsoring organization may be unable to protect a player from an initial blow to the head, the player can be protected from a secondary injury from a repeated blow, where "the greatest danger exists" and was "reasonably to be expected." Such secondary injury "increase[s] the risks to a participant over and above those inherent in the sport." *Knight*, 834 P.2d at 708. Such secondary injury is not "inevitable or unavoidable." *Campbell v. Derylo*, 89 Cal. Reptr. 2d 519, 524 (Cal. Ct. App. 1999).

A comparison of *Kahn v. East Side Union High School*, 75 P.3d 30 (Cal. 2003), with *Avila v. Citrus Community College District*, 131 P.3d 383 (Cal. 2006), provides further support. In *Kahn*, a fourteen-year-old girl broke her neck attempting to perform a racing dive into a shallow pool while practicing for a swim meet. The California Supreme Court wrote that "the object to be served by the doctrine of primary assumption of risk in the sports setting is to avoid recognizing a duty of care when to do so would tend to alter the nature of an active sport or chill vigorous participation in the activity." *Id.* at 43. According to plaintiff's evidence, the defendant swim coach had not trained her to perform such a dive and had pressured her into performing it. The Court held that the assumption-of-risk doctrine did not apply. Reversing a summary judgment for the defendant coach, the Court wrote, "Plaintiff's evidence supports the conclusion that the maneuver of diving into a shallow racing pool, if not done correctly, poses a significant risk of extremely serious injury, and that there is a well-established mode of instruction for teaching a student to perform this maneuver safely." *Id.* at 33. According to plaintiff's evidence, the defendant "engag[ed] in conduct that was reckless in that it was totally outside the range of ordinary activity involved in teaching or coaching the sport of competitive swimming." *Id.* at 48. *See also Galardi v. Seahorse Riding Club*, 20 Cal. Rptr. 2d 270 (Cal. Ct. App. 1993) (holding a horseback riding instructor liable for increasing the risk during a training activity).

In *Avila v. Citrus Community College District*, 131 P.3d 383 (Cal. 2006), in contrast, plaintiff was a community college baseball player. He alleged that he had been hit by a "beanball" thrown by the pitcher for the opposing team from Citrus College, in retaliation for a previously hit Citrus College batter. Applying the primary assumption of risk

doctrine, the California Supreme Court held that Citrus College did not owe plaintiff a duty of care to protect against beanballs: "Being hit by a pitch is an inherent risk of baseball. The dangers of being hit by a pitch, often thrown at speeds approaching 100 miles per hour, are apparent and well known: being hit can result in serious injury or, on rare tragic occasions, death." *Id.* at 393 (internal citations omitted).

The case before us resembles *Kahn* more closely than *Avila*. H.C.'s coach knew that she had been hit in the head, had time to evaluate her, and knew or should have known that returning her to play had the potential of significantly exacerbating her injury. As in *Kahn*, where the injury did not result from a risk inherent in competitive swimming, the secondary injury suffered by H.C. did not result from an inherent risk in water polo. And unlike in *Avila*, where the injury resulted from a one-time blow to the head, the secondary injury suffered by H.C. occurred after the initial blow.

Finally, the case before us is remarkably similar to *Wattenbarger v. Cincinnati Reds, Inc.*, 33 Cal. Rptr. 2d. 732 (Cal. Ct. App. 1994). A seventeen-year-old high school baseball player suffered an arm injury while pitching during a tryout for the Cincinnati Reds, a major league baseball team. On his third pitch, the plaintiff felt his arm " 'pop' but experienced no particular pain." *Id.* at 734. He stepped off the mound and told Reds personnel that his arm had popped. "Receiving no response, plaintiff returned to the mound and threw another pitch. He immediately experienced severe pain in his arm and quit pitching." *Id.* The defendant team contended that plaintiff's arm injury was inherent in the game of baseball. The California Court of Appeal disagreed. It wrote that the "pop" experienced during the third pitch was

inherent, but that the injury during the fourth pitch was not. The Court wrote:

> Had plaintiff stopped after his third pitch . . . , we would have no difficulty finding primary assumption of risk a bar to recovery. . . . However, the incident did not end with the third pitch. Viewed in the light most favorable to plaintiffs, the evidence establishes defendants initially directed plaintiff to pitch and then permitted him to continue after he informed them his arm had "popped." It is reasonable to infer that when plaintiff, a 17-year-old, informed the Reds' personnel that his arm had "popped," he was seeking guidance as to how to proceed. Hearing nothing to countermand the original instruction to pitch, and obviously anxious to please and impress the scouts, plaintiff threw another pitch, thereby causing further injury.

*Id.* at 736–37.

The court's holding in *Wattanberger* rests on the primary-secondary distinction that is at the core of Mayall's case. The first injury (the "pop") was inherent in the game of baseball. The secondary injury, suffered after the plaintiff was allowed to continue pitching after experiencing the "pop," was not inherent. Because it was foreseeable to Reds personnel that "further use of the injured member" posed an increased risk compared with the risk before the "pop," the court held that the secondary injury was not an "integral part of the sport itself." *Knight*, 834 P.2d. at 708. Similarly, Mayall concedes that H.C.'s first injury, incurred when she was hit in the face

during the first game, was inherent in the game of water polo. However, the secondary injury, incurred when H.C. was hit in the head again after being returned to play, was not inherent in the game. "[D]azed" from the initial blow, H.C. swam to the side of the pool to speak with her coach, but, like the pitcher in *Wattenberger*, she received no guidance or instruction that would have removed her from play. As the Court of Appeal wrote in *Wattenberger*, "It requires no depth of analysis to recognize that when one injures himself, further use of the injured member will likely exacerbate the condition." *Wattenberger*, 33 Cal. Rptr. 2d at 738.

We recognize that the California Supreme Court cautioned in *Knight* that § 1714(a) does not impose a duty of care that would "alter fundamentally the nature of the sport." *Knight*, 834 P.2d at 710. Citing *Knight*, the Court of Appeal wrote in *Ferrari v. Grand Canyon Dories*, 38 Cal. Rptr.2d 65, 67 (Cal. Ct. App. 1995), "The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature." However, USA Water Polo has, by its own actions, made clear that using a detailed concussion-management and return-to-play protocol does not alter the fundamental nature of water polo. As noted above, the SAC alleges that USA Water Polo has imposed on its national team a "USA Water Polo Concussion Policy," under which players who have suffered concussions are protected from further injury. Given its policy for the national team, USA Water Polo can hardly contend that a comparably detailed concussion-management policy and return-to-play protocol for its youth-league players would fundamentally alter the nature of water polo.

## 2. Fulfilling the Duty of Care

USA Water Polo argues in its brief that if it did owe a duty of care to H.C., the "existence" of its "Rules Governing Coaches' Conduct," applicable to all USA Water Polo teams, fulfilled that duty. We disagree.

The Rules Governing Coaches' Conduct are contained in a six-page, single-spaced document. The Rules cover conduct under a number of different headings: "sportsmanship," "violent behavior," "recruiting," "registration," "incident reports," "drugs and alcohol," "relationship with athletes," "background screening," "CPR and first aid screening," "reporting rules violations," and "enforcement." There is no heading labeled "athlete safety" or "concussion protocol." The language applicable to concussions comes under the heading "sportsmanship." The Rules provide as follows:

> **Sportsmanship**
>
> Coach members of USA Water Polo are expected to demonstrate good sportsmanship. This includes, but is not limited to, avoiding the following conduct:
>
> > 1. Hazing, bullying, harassing or taunting: . . .
> >
> > 2. Physically or emotionally abusing: (a) an athlete, (b) coach, (c) a referee or (d) any person participating in, or conducting, USA Water Polo sanctioned events.

. . .

> b. The term "physical abuse" means: (i) contact or non-contact conduct that results in, or reasonably threaten[s] to, cause physical harm . . . or (ii) any act or conduct described as physical abuse or misconduct under any federal or state law (e.g. child abuse, child neglect, assault). . . . Examples of physical abuse include, without limitation, behaviours such as: . . . (vii) *encouraging or permitting an athlete to return to play pre-maturely following a serious injury (e.g., a concussion) and without the clearance of a medical professional.*

(Bolding in original; italics added.)

The USA Water Polo Concussion Policy applicable to the national team, as well as the Zurich II Protocol, are substantially different from the Rules of Conduct. The Concussion Policy is a one-page single-spaced document, promulgated and applied to the national team in 2011, three years before H.C.'s injury. The Policy addresses only head injuries. It provides:

> Once a player has been identified as suffering a concussion or mild traumatic brain injury (MTBI) by a medical professional or a coach or team manager recognizes the following:

*Any injury that may result in a bad headache, altered levels of alertness, or unconsciousness and/or affecting memory, judgment, reflexes, speech, balance, coordination, and sleep patterns.*

The following Protocol should be followed:

1.  Initial evaluation by an ATC, EMT, DC, D.O., or MD following the SCAT 2 protocol (see attached).

2.  The team physician should be notified immediately and return to play is prohibited on the same day and will be determined by the team physician or physician responsible for the athlete. Protocol is as per SCAT 2 recommendations as well. The athlete will be followed periodically by the physician to access [sic] return to play.

3.  The physician will notify the coach after each evaluation as to athlete's condition pending the athlete's consent to share medical information.

(Italics and underlining in original.) "SCAT 2" is shorthand for Sport Concussion Assessment Tool 2. SCAT 2 is a detailed four-page questionnaire designed to assess the seriousness of a head injury. On its first page are twenty-two criteria such as "headache," "dizziness," and "confusion," with assessments rated on a scale of 0 to 6 for each of the

criteria. SCAT 2 at 1. At the bottom of the first page, SCAT 2 states in bold print: "**Any athlete with a suspected concussion should be REMOVED FROM PLAY, medically assessed, monitored for deterioration (i.e., should not be left alone) and should not drive a motor vehicle.**" *Id.*

The Zurich II Protocol was published in 2012, one year after USA Water Polo promulgated its Water Polo Concussion Policy and applied it to the national team. The Protocol is a twelve-page single-spaced document devoted entirely to concussions in sporting activities. Among other things, the Protocol provides detailed guidance for detecting and treating concussions. It provides:

> **On-field or sideline evaluation of acute concussion**
>
> When a player shows ANY features of a concussion:
>
> > A. The player should be evaluated by a physician or other licensed healthcare provider onsite using standard emergency management principles and particular attention should be given to excluding a cervical spine injury.
> >
> > B. The appropriate disposition of the player must be determined by the treating healthcare provider in a timely manner. If no healthcare provider is available, the player should be safely removed from

practice or play and urgent referral to a physician arranged.

C.  Once the first aid issues are addressed, an assessment of the concussive injury should be made using the SCAT3 or other sideline assessment tools.

D.  The player should not be left alone following the injury and serial monitoring for deterioration is essential over the initial few hours following injury.

E.  A player with diagnosed concussion should not be allowed to RTP [Return to Play] on the day of injury.

(Bolding in original.)   The Protocol attaches copies of SCAT 2, SCAT 3 and Child SCAT 3, as appendices.

The differences between the Rules Governing Coaches' Conduct, on the one hand, and the Water Polo Concussion Policy and the Zurich II Protocol, on the other, are striking. First, the Rules cover a large variety of topics, ranging far beyond concussions.  Second, the Rules are merely hortatory, saying what the coaches are "expected" to do.   Third, the language in the Rules referring to concussions is, as stated in the SAC, "buried in the fine print."   Fourth, the language referring to concussions comes under the misleading heading of "sportsmanship."   Fifth, the language comes under the additionally misleading heading of "physical abuse," defined as "(i) contact or non-contact conduct that results in, or reasonably threaten[s] to, cause physical harm . . . or (ii) any act or conduct . . . [such as] child abuse, child neglect,

assault." Sixth, the language is provided only as the seventh example of such "physical abuse." Finally, the language is vague, advising coaches against allowing an athlete to return to play following a "serious injury," and providing a concussion only as an example of such an injury.

In stark contrast, the USA Water Polo Concussion Policy and the Zurich II Protocol are single-topic documents addressing only head injuries. They are mandatory rather than hortatory. Their instructions are detailed and clear, instructing coaches and others precisely what to do to in order to assess the seriousness of a blow to the head, and in order to protect athletes who may have suffered a concussion. Finally, they make clear the seriousness of a suspected concussion, with SCAT 2 telling coaches in bold print, "Any athlete with a suspected concussion should be REMOVED FROM PLAY, medically assessed, monitored for deterioration[.]"

The SAC alleges that the USA Water Polo Concussion Policy and the Zurich II Protocol instruct coaches and other officials as to the accepted standard of care for athletes who may have suffered concussions during an athletic contest. It further alleges that the Rules Governing Coaches' Conduct fall short of providing such instruction, and that the existence of the Rules does not satisfy USA Water Polo's duty of care. Based on the above comparison, we agree and conclude that the existence of the Rules does not satisfy the duty of care.

## B. Voluntary Undertaking

Under California law, a voluntary undertaking claim requires a showing that (1) an actor undertook to render services to another; (2) the services rendered were of a kind

the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking. *See Artiglio v. Corning Inc.*, 957 P.2d 1313, 1318 (Cal. 1998).

The SAC alleges that USA Water Polo voluntarily undertook the duty of ensuring that "proper safety precautions have been taken to protect the personal welfare of . . . athletes," and committed itself to "creating a healthy and safe environment of all of [its] members." The SAC, citing USA Water Polo's national team concussion protocol, further alleges that USA Water Polo "realize[d] that rules regarding concussion management and return to play were necessary for the protection of H.C. and the Class so as not to increase the risk of prolonging concussion injuries." The SAC alleges that by failing to establish a concussion-management and return-to-play protocol for its youth water polo league, USA Water Polo failed to exercise reasonable care in the performance of its undertaking—ensuring a healthy and safe environment for its players—resulting in H.C.'s concussion and other head injuries to members of the purported Class.

USA Water Polo argues that the SAC insufficiently alleges a duty "specifically" undertaken by USA Water Polo. According to USA Water Polo, the duty it undertook to "create a healthy and safe environment" was insufficient to trigger liability. But the SAC does not just allege a general undertaking by USA Water Polo to promote health and

safety. Rather, it alleges that USA Water Polo undertook a specific responsibility to establish and enforce rules to ensure the safety of athletes in its youth water polo league. Indeed, the SAC alleges that USA Water Polo "regulates every aspect of water polo, including the enactment of rules regarding player safety and health," and that USA Water Polo's own bylaws "require it to ensure proper safety precautions have been taken to protect the personal welfare of the athletes" at its events.

Citing *Nalwa v. Cedar Fair, L.P.*, 290 P.3d 1158 (Cal. 2012), USA Water Polo further argues that its actions do not support a voluntary undertaking claim. In *Nalwa*, the plaintiff sued an amusement park owner for negligence after she fractured her wrist while riding a bumper car. *Id.* at 1160. Plaintiff argued that defendant's efforts to minimize head on collisions between bumper cars demonstrated that defendant owed her a duty to eliminate such collisions. *Id.* The California Supreme Court rejected this argument, explaining that "not every rule imposed by an organizer or agreed to by participants in a recreational activity reflects a legal duty enforceable in tort." *Id.* at 1163. The Court went on to explain that an operator might still "violate its 'duty to use due care not to increase the risks to a participant over and above those inherent' in the activity . . . by failing to provide routine safety measures." *Id.* In the case before us, the SAC alleges that USA Water Polo failed to use its authority to provide routine and important safety measures, including a concussion-management and return-to-play protocol that protects players. USA Water Polo thereby increased the risk of secondary concussions to players who improperly returned to play, a risk that USA Water Polo could eliminate through the implementation of concussion-management protocols already used by its national team.

Finally, USA Water Polo argues that Mayall's voluntary undertaking claim fails because the SAC fails to allege that H.C. relied on USA Water Polo. California law makes clear that reliance is only one of several ways in which a plaintiff claiming voluntary undertaking may allege an actionable harm. A plaintiff may also support a voluntary undertaking claim by alleging (1) that an "actor's carelessness increased the risk of . . . harm," or (2) "the undertaking was to perform a duty owed by the other to the third persons[.]" *Artiglio*, 957 P.2d at 1318. Here, the SAC alleges that USA Water Polo increased the risk of harm to H.C. by failing to adopt consensus return-to-play protocols which in turn increased the risk that players would suffer secondary concussions. As the SAC alleges, USA Water Polo is "the rule-making authority" for water polo in the United States "with the self-proclaimed responsibility for player safety and health" and it therefore "has a duty to not increase the risk of injuries." The failure of USA Water Polo to promulgate safety rules that would have protected H.C. is sufficient to support a voluntary undertaking claim.

## C. Gross Negligence

California law defines "gross negligence" as "either a 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct.'" *City of Santa Barbara v. Superior Court*, 161 P.3d 1095, 1099 (Cal. 2007). The SAC alleges that the USA Water Polo's "extreme departure from the ordinary standard of conduct" constituted gross negligence.

The SAC alleges that USA Water Polo repeatedly ignored the known risk of secondary injuries, and repeatedly ignored requests that it implement a concussion-management and

return-to-play protocol. The SAC alleges that the risks of repeat concussions had been well known for many years, and that a consensus for return-to-play protocols for dealing with athlete concussions has been well-established since 2002. The SAC alleges that as early as September 2010, USA Water Polo's insurer had "emailed USA Water Polo to discuss state concussion and return to play laws that would impact USA Water Polo," concluding that "[g]iven the serious nature of the risk, we expect that this issue will continue to receive national attention and will maintain momentum until the prevention, recognition and management of concussions in youth sports has been adequately addressed." The SAC alleges that as early as 2011, parents and educators were raising concerns with USA Water Polo about the need for a concussion protocol. Rather than formulate and implement a protocol for its youth athletes, USA Water Polo did nothing. Even as a number of state legislatures began to pass laws codifying return-to-play protocols for dealing with concussions, USA Water Polo continued to do nothing. Finally, USA Water Polo failed to implement a known protocol for its youth participants despite formulating and implementing such a protocol for its adult athletes on the national team.

These allegations, taken as true, demonstrate that USA Water Polo was well-aware of the severe risk of repeat concussions and of the need to implement a policy to remove players from play after suffering a head injury. USA Water Polo's inaction in the face of substantial evidence of risk of harm, constitutes "an extreme departure from the ordinary standard of conduct," and amounts to gross negligence under California law.

Conclusion

For the foregoing reasons, we hold the SAC pleads sufficient facts to support claims upon which relief can be granted under California law for negligence, voluntary undertaking, and gross negligence.

**REVERSED and REMANDED.**