**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD DENT; JEREMY NEWBERRY; ROY GREEN; J. D. HILL; KEITH VAN HORNE; RON STONE; RON PRITCHARD; JAMES MCMAHON; MARCELLUS WILEY, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs-Appellants*, <br><br> v. <br><br> NATIONAL FOOTBALL LEAGUE, a New York unincorporated association, <br><br> *Defendant-Appellee.* | No. 19-16017 <br><br> D.C. No. 3:14-cv-02324-WHA <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted March 12, 2020
San Francisco, California

Filed August 7, 2020

Before: Richard C. Tallman, Jay S. Bybee, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## California Law / Negligence / Preemption

The panel affirmed in part and reversed in part the district court's dismissal of a third amended complaint ("TAC") brought by a putative class of former National Football League ("NFL") players, alleging that the NFL negligently facilitated the hand-out of controlled substances to dull players' pain and to return them to the game in order to maximize profits.

The panel affirmed the district court's dismissal of plaintiffs' per se theory of negligence. The panel held that while the district court's order held plaintiffs to an unnecessarily high pleading standard, it still correctly identified the main deficiency in plaintiffs' pleading: the dearth of allegations regarding NFL behavior that violated the duty to comply with federal and state laws outlined in the TAC. In addition, the panel held that although it was evident that plaintiffs suffered serious and long-standing injuries, plaintiffs could not explain exactly what NFL actions were responsible for them, and therefore it was impossible to ascertain whether there was proximate causation.

The panel held that plaintiffs sufficiently alleged a voluntary undertaking theory of negligence to survive a motion to dismiss, and the district court erred in concluding otherwise. Specifically, the panel held that plaintiffs' allegations supported their theory that the NFL undertook

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the duty of overseeing the administration of the distribution of pain medications to players, and the NFL was aware that it should be providing protections. The panel also concluded that there were adequate allegations that the NFL's carelessness in allowing drugs to be distributed as they were increased the risk of harm to plaintiffs.

Plaintiffs argued that the TAC allegations supported a negligence claim arising out of the special relationship between themselves, as players, and the NFL. The panel rejected the argument because plaintiffs failed to reference a special relationship in the TAC, and upheld the district court's dismissal of this theory.

Because the district court did not consider whether plaintiffs' voluntary undertaking claim was preempted by § 301 of the Labor Management Relations Act, the panel remanded to the district court for consideration in light of the relevant collective bargaining agreements, and the guidance in prior appeal outlined in *Dent v. Nat'l Football League*, 902 F.3d 1109 (9th Cir. 2018).

---

## COUNSEL

William N. Sinclair (argued), Phillip J. Closius, Steven D. Silverman, and Andrew G. Slutkin, Silverman Thompson Slutkin & White LLC, Baltimore, Maryland, for Plaintiffs-Appellants.

Pratik A. Shah (argued), Daniel L. Nash, and James E. Tysse, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Allen J. Ruby, Jack P. DiCanio, and Patrick Hammon, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, California; for Defendant-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

Plaintiffs, nine former National Football League (NFL) players, represent a putative class of NFL athletes who played for any NFL-member Club between 1969 and 2014 and allegedly suffered injury from what they claim was a "return to play" business plan prescribed by the NFL. According to Plaintiffs' Third Amended Complaint (TAC), the NFL negligently facilitated the hand-out of controlled substances to dull players' pain and return them to the game after injury in order to maximize revenues by keeping marquee players on the field. The NFL allegedly conducted studies and promulgated rules regarding how Clubs should handle distribution of the medications at issue, but failed to ensure compliance with them, with medical ethics, or with federal laws such as the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* We previously determined that Plaintiffs' claims, as long as they relate to actions of the NFL itself, and not the Clubs, were not preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 141. *See Dent v. Nat'l Football League*, 902 F.3d 1109 (9th Cir. 2018) (hereinafter *Dent I*). On remand from that decision, the district court remained convinced that Plaintiffs' allegations center too heavily on the actions of the Clubs and granted the NFL's motion to dismiss for failure to state a claim against the NFL.

Plaintiffs now bring another appeal, challenging the district court's dismissal of their only remaining claim for negligence, which they argue they have sufficiently alleged under three different theories: negligence per se, voluntary undertaking, and special relationship. Though we agree with the district court that two of those theories were

insufficiently pled, we conclude that Plaintiffs' voluntary undertaking theory survives dismissal, given sufficient allegations in the TAC of the NFL's failure to "use its authority to provide routine and important safety measures" regarding distribution of medications and returning athletes to play after injury. *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1067 (9th Cir. 2018). If proven, a voluntary undertaking theory could establish a duty owed by the NFL to protect player safety after injury, breach of that duty by incentivizing premature return to play, and liability for resulting damages.

I

Plaintiffs initially filed suit against the NFL in May 2014, followed by an amendment a few months later. At that time, Plaintiffs' claims included negligence (under a per se theory), negligent hiring and retention, negligent misrepresentation, fraud, and fraudulent concealment on behalf of a class of players who had "received or were administered" drugs by anyone affiliated with the NFL. *See Dent I*, 902 F.3d at 1115. Plaintiffs sought damages, injunctive and declaratory relief, and medical monitoring. *Id.* The NFL filed a motion to dismiss, arguing that Plaintiffs' claims were preempted by § 301 of the Labor Management Relations Act (LMRA), which the district court granted. *Id.* at 1115–16.

On appeal in *Dent I*, we reversed the district court's preemption decision as to all claims, including negligence. Plaintiffs' negligence claim was premised on a per se violation of federal statutes like the Controlled Substances Act (CSA) and the Food, Drug, and Cosmetic Act (FDCA), as well as corresponding state laws. *Id.* at 1117–18. We determined that, although the CSA and FDCA did not provide a cause of action, the NFL did have a duty to use

"reasonable care in the handling, distribution, and administration of controlled substances," which arises from the "general character of [that] activity" and the "players' right to receive medical care from the NFL that does not create an unreasonable risk of harm." *Id*. at 1118–19 (alteration in original). The claim was not preempted by § 301 of the LMRA because Plaintiffs' allegations related to the NFL (not the member Clubs), and the NFL's duty to properly handle controlled substances was not defined by the Collective Bargaining Agreements (CBA) between the Clubs and players. *Id*. at 1121. Though some confusion naturally arose from the fact that the NFL is an unincorporated association comprised of the Clubs (thirty-two of them), and there is much overlap in the membership and governance of those entities by team owners, we instructed that any further proceedings in the case center on the actions of "the NFL and NFL personnel" alone. *Id.*

Upon remand, Plaintiffs amended their complaint again, to form the operative version on appeal: what is now the TAC.[1] The TAC is limited to a single remaining negligence claim; all other causes of action were voluntarily abandoned. At its core, the claim centers on the theory that "[t]he NFL was required to, or voluntarily undertook the duty to, comply with federal and state laws regulating the manner in which [pain] Medications were administered and distributed," and failed to do so because of its established "business culture in which everyone's financial interest depends on supplying

---

[1] The TAC apparently incorporates information obtained during discovery in the *Evans v. Arizona Cardinals Football Club, LLC* litigation that another group of NFL players, represented by the same counsel as Plaintiffs here, brought against the individual Clubs. 231 F. Supp. 3d 342 (N.D. Cal. 2017) (order granting summary judgment for Clubs on remaining RICO claim due to statute of limitations bar), *aff'd*, 761 F. App'x 701 (9th Cir. 2019).

Medications to keep players in the game." The medications at issue include opioids, non-steroidal anti-inflammatories (such as Toradol), and anesthetics. Passages from the CSA and FDCA are cited in the TAC to bolster Plaintiffs' negligence per se theory, and documents uncovered during the parallel *Evans* litigation against the Clubs are quoted to develop Plaintiffs' narrative alleging the NFL's involvement in the putative drug-distribution scheme. One such document states that "reputational and financial interests . . . and the nature of the sport combine to make opioid and other pain medication usage much more prevalent in the NFL than in virtually any other industry, population or endeavor," which "means that there is shared responsibility and joint culpability for the problem."

What is most striking about the TAC, the simplicity of Plaintiffs' single legal claim notwithstanding, is the painstaking recitation of injuries sustained by Plaintiffs and the medications they recall receiving during their tenure with the NFL. For example, Plaintiff Jim McMahon, a player for six different NFL Club teams during his career, sustained shoulder injuries (among many others) that included dislocation, rotator cuff tears, tendonitis, bone spurs, osteoarthritis, and supraspinatus tears, and he recalls receiving "hundreds, if not thousands, of injections . . . and pills," such as Percocet, Novocain, amphetamines, sleeping pills, muscle relaxers, and Toradol. An NFL-created document obtained by Plaintiffs purportedly notes that "the number of prescription medication pills provided to a player on a single occasion, [varies] from as few as one to as many as 40 pills at one time." The named Plaintiffs' wide-ranging internal organ and musculoskeletal injuries, and substances distributed to manage those injuries (if true), are shocking, even to a reader familiar with the physically demanding

nature of professional football and the resulting injuries from playing the game.

The NFL filed a motion to dismiss the TAC under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, which the district court granted in April 2019. The court's order reasoned that the TAC did not plausibly allege negligence under a per se theory because it did not provide evidence of "direct involvement in the handling, distribution, and administration" of controlled substances by "*the NFL itself*." The order went on to swiftly dismiss Plaintiffs' other theories, and thus their negligence claim altogether. Plaintiffs timely appealed.

We have jurisdiction under 28 U.S.C. § 1291 and review the district court's Rule 12(b)(6) dismissal de novo. *See Lacey v. Maricopa County*, 693 F.3d 896, 911 (9th Cir. 2012) (en banc).

II

In reviewing a complaint at the motion to dismiss stage, we "must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). We note that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Dismissal is only proper where the allegations in the

complaint do not factually support a cognizable legal theory. *See Chubb Custom*, 710 F.3d at 956.

Plaintiffs present three possible theories under which their action might proceed; we address each in turn.

## A

Plaintiffs argue that, contrary to the district court's determination, they have sufficiently pled a negligence claim under a per se theory. Plaintiffs must allege facts to support the four elements of negligence: duty, breach, causation, and damages. *Mayall*, 909 F.3d at 1060 (citing *Beacon Residential Cmty. Ass'n v. Skidmore, Owings & Merrill LLP*, 327 P.3d 850, 853 (Cal. 2014)).[2] "[T]he doctrine of negligence per se is not a separate cause of action, but creates an evidentiary presumption that affects the standard of care in a cause of action for negligence." *Johnson v. Honeywell Int'l Inc.*, 101 Cal. Rptr. 3d 726, 731 (Cal. Ct. App. 2009) (alteration in original, citation omitted). Thus, in addition to pleading facts sufficient to support the elements of negligence, a complaint need only support Plaintiffs' theory of the case and may refer to a statute in doing so. *See Jones v. Awad*, 252 Cal. Rptr. 3d 596, 605 (Cal. Ct. App. 2019) ("[T]he doctrine of negligence per se is within the scope of pleadings that allege general negligence, as proof of a breach of duty is not limited to common law standards of care."); *Quiroz v. Seventh Ave. Ctr.*, 45 Cal. Rptr. 3d 222, 244 (Cal. Ct. App. 2006) (negligence per se "operates to establish a presumption of negligence for which the statute serves the

---

[2] Although Plaintiffs seek to represent a nationwide class, we will follow in the footsteps of the district court and our previous opinion and analyze Plaintiffs' negligence claim under California common law—a convenience the parties also adopted in their briefing. *See Dent I*, 902 F.3d at 1117 n.4.

subsidiary function of providing evidence of an element of a preexisting common law cause of action").

Plaintiffs' primary argument for reversal of the district court's dismissal of this theory of their claim is that the district court misconstrued both the thrust of their allegations and the NFL's duty, as identified in *Dent I*. We agree in some respects, but ultimately conclude that there was no error in the district court's negligence per se dismissal because the court correctly identified deficiencies in Plaintiffs' breach allegations.

In *Dent I* we determined that, while "no statute explicitly establishes [] a duty" to "exercise reasonable care in the distribution of medications," such a duty arises from "the general character of [that] activity." 902 F.3d at 1119 (second alteration in original). And, "to the extent the NFL is involved in the distribution of controlled substances," it has such a duty toward Plaintiffs. *Id.* The district court's characterization of that holding missed the mark somewhat, requiring that Plaintiffs allege the "NFL's *direct* involvement in the handling, distribution, and administration of [] controlled substances," consistent with the fairly clinical definitions of those terms in the CSA and FDCA. But Plaintiffs are correct that *Dent I* did not adopt such a rigid construction, and in fact referred to allegations that the NFL may have "directly *and indirectly* supplied players" with drugs or "*coordinat[ed]* the illegal distribution of painkillers and anti-inflammatories," in defining the duty. *Id.* at 1115, 1118 (emphasis added, alteration in original).

Examining the TAC with that clarification in mind, it does appear that Plaintiffs facially allege a duty somewhat similar to that identified in *Dent I*. The TAC states: "The NFL was required to . . . comply with federal and state laws regulating the manner in which [the defined] Medications

were administered and distributed.  It failed to do so . . . and that failure directly and proximately caused the injuries for which Plaintiffs seek damages."  Plaintiffs point to specific provisions of the federal drug statutes that they claim the NFL violated through the actions of "NFL doctors and trainers."  For example, the TAC cites to CSA provisions that make it "unlawful for any person to knowingly or intentionally '. . . distribute, or dispense, a controlled substance[]' in violation of the CSA," 21 U.S.C. § 841(a)(1), and extend liability to "[a]ny person who attempts or conspires to commit," such an offense, *id.* § 846.

But what the TAC fails to do is marshal facts that tether the alleged statutory violations to any concrete actions of the NFL (*i.e.*, allege breach).  This shortcoming became clear at oral argument when Plaintiffs' counsel acknowledged that the phrase "NFL doctors and trainers," as used in the TAC, does not actually refer to any employees of the NFL itself. Despite the TAC's separate references to "Club doctors and trainers," Plaintiffs' counsel conceded that the "NFL" and "Club" doctors and trainers are one and the same, and are in fact the hired hands of the Clubs.  While the district court's order held Plaintiffs to an unnecessarily high pleading standard, it still correctly identified the main deficiency in Plaintiffs' pleading: the dearth of allegations regarding NFL behavior that violates the duty to "comply with federal and state laws" outlined in the TAC.  Even allowing for claims of "indirect" supply or "coordinat[ion of] the illegal distribution" of substances, as discussed in *Dent I*, 902 F.3d at 1115, 1118, we cannot say that Plaintiffs' allegations of breach sufficiently connect back to the NFL.  By Plaintiffs' own admission, the Club doctors and trainers appear to be the only relevant actors purportedly in violation of statutory requirements.

And although it is evident that Plaintiffs suffered myriad serious and long-lasting injuries, because they cannot tell us exactly what NFL actions are responsible for them, it is impossible to ascertain whether there is proximate causation. *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1206 (9th Cir. 2003) (liability attaches to "foreseeable consequences that the defendant's negligence was a substantial factor in producing" (quoting *Mendoza v. City of Los Angeles*, 78 Cal. Rptr. 2d 525, 530 (Cal. Ct. App. 1998))). The absence of facts in the TAC pertaining to the NFL's alleged breach and causation of damages dooms any possible recovery under this theory. We affirm the district court's dismissal of Plaintiffs' per se theory of negligence.

B

Plaintiffs offer voluntary undertaking as an alternative theory for the NFL's negligence liability.[3] In California, a voluntary undertaking negligence claim may be sufficiently pled by showing, *inter alia*, that:

> (1) an actor undertook to render services to another; (2) . . . of a kind the actor should have recognized as necessary for the protection of [the plaintiff]; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the failure . . . resulted in physical harm to the

---

[3] The NFL argues that Plaintiffs are judicially estopped from asserting a voluntary undertaking theory because it was not raised at the time of *Dent I*. We disagree. Plaintiffs' decision to pursue a voluntary undertaking theory in the face of an earlier assertion that their negligence per se argument was the "primary duty at issue," does not rise to the level of a "clearly inconsistent" position. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

> [plaintiff]; and (5) (a) the actor's carelessness increased the risk of such harm . . . .

*Mayall*, 909 F.3d at 1066 (citing *Artiglio v. Corning Inc.*, 957 P.2d 1313, 1318 (Cal. 1998)).  Plaintiffs liken this case to *Mayall*, in which we concluded that a negligence claim based on voluntary undertaking should survive 12(b)(6) dismissal where a putative class of youth water polo players alleged that, "by failing to establish a concussion-management and return-to-play protocol for its youth water polo league, USA Water Polo failed to exercise reasonable care in the performance of its undertaking—ensuring a healthy and safe environment for its players." *Id.* at 1067. The *Mayall* plaintiffs asserted that USA Water Polo "regulate[d] every aspect of water polo, including the enactment of rules regarding player safety and health," and USA Water Polo's own bylaws "require[d] it to ensure proper safety precautions have been taken to protect the personal welfare of the athletes" at its events. *Id*. Although the team coaches and trainers were ultimately responsible for the decision to put a player back in the game after that player suffered a potential concussion, USA Water Polo itself could still be liable for failing to promote regulations that may have avoided return-to-play injuries. *Id*. at 1067–68.

Similarly, the TAC alleges that the NFL "voluntarily undertook a duty" to "ensure the proper recordkeeping, administration and distribution of Medications," but ultimately failed to protect players due to its "business culture in which everyone's financial interest depends on supplying Medications to keep players in the game." Plaintiffs support this statement with factual allegations that the NFL created a drug oversight program in 1973, which "*required* teams and their doctors to report to the NFL regarding the administration of Medications."  Beginning in

at least the early 1990s, the NFL allegedly "began auditing clubs' compliance with [federal drug] laws," such as "the types of drugs being administered, the amounts in which they were administered," and related information.  Plaintiffs also claim that the NFL has "*mandated* procedures to control the drug distribution system," including the registration of the Clubs' facilities as storage facilities for controlled substances, the use of tracking software by SportPharm, and periodic drug-use audits by the NFL Security Office.  NFL Club trainers and doctors are supposedly "mandated by the NFL to meet on a yearly basis" with NFL officials, and doctors provide "reports directly to the League about the Medications."  The NFL also purportedly funded studies on Toradol use, which resulted in Toradol guidelines that were not followed.

Furthermore, Plaintiffs claim that the NFL is aware of improper handling of pain medications and that its "standard of treatment for professional athletes [is] 'outside the lines.'" A document written by a non-Club doctor, which was apparently commissioned by the NFL, bluntly states that both "appropriate (properly prescribed and monitored) and inappropriate opioid and non-opioid pain medication use" are "much more prevalent in the NFL than in virtually any other industry, population or endeavor," which "means that there is a shared responsibility and joint culpability for the problem."  And the NFL was alerted, via the same report, that players "who would otherwise not play or play at the same level of competitiveness may be induced by a pain medication and their personal financial/reputational incentives to play under conditions that could exacerbate their injuries and hinder their recovery," and "will be at longer-term risk for developing abuse or addiction."

The NFL has promulgated rules such as the "NFL Prescription Drug Program and Protocol," with the purpose (as that document allegedly states) of "provid[ing] guidelines for the utilization of all prescription drugs provided to players and team personnel by physicians and other healthcare providers and associated the [*sic*] NFL clubs" and "to ensure [] appropriate handling (purchase, distribution, dispensing, administration and recordkeeping)" in compliance with "regulations of the Federal Drug Enforcement Administration (DEA) as they apply to controlled substances." And yet, "when the DEA investigated the clubs [in 2010], nothing had changed. The clubs still did not understand—and were in woeful non-compliance with—the law regarding controlled substances, as evidenced by the many, many violations thereof." Players continued to face the heightened risks associated with playing through their injuries while receiving improperly handled and administered medications, and the NFL allegedly was aware of this from its audit results but nonetheless turned a blind eye to maximize its revenues.

We agree with Plaintiffs that their allegations read much like those in *Mayall*.**[4]** We, and other courts, have previously noted that the NFL "promotes, organizes, and regulates professional football in the United States," just as USA Water Polo regulates its sport. *Dent I*, 902 F.3d at 1114 (quoting *Williams v. Nat'l Football League*, 582 F.3d 863, 868 (8th Cir. 2009)). Building on this baseline, the TAC

---

**[4]** We reject the NFL's attempt to distinguish *Mayall* on the basis that it involved youth (rather than adult) athletes. Nothing in *Mayall* suggests that the logic or holding of the case should be cabined that way. The focus is instead on the harm that results from prematurely returning athletes to play after they have already suffered an injury. *Mayall*, 909 F.3d at 1067.

paints a picture of the NFL's "mandated" and "required" audits, oversight, and procedures regarding drug distribution across member Clubs, as well as the NFL's failure to enforce rules that it knows are necessary to avoid further injury to players. These allegations support Plaintiffs' theory that the NFL undertook "the duty of overseeing [the] administration" of the distribution of pain medications to players and is aware that it should be providing protections.

The NFL argues that no court "has ever held that a professional sports league owed such a duty to intervene and stop mistreatment by the league's independent clubs" and there is "no reason to break new ground here." But the NFL misconstrues the alleged duty as one to "intervene" in the Clubs' drug management, rather than for the NFL to properly exercise a voluntarily undertaken duty to create and then enforce league-wide rules regarding player safety and drug distribution. "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." *Mayall*, 909 F.3d at 1061 (quoting *Knight v. Jewett*, 834 P.2d 696, 708 (Cal. 1992)). *See also Wattenbarger v. Cincinnati Reds, Inc*., 33 Cal. Rptr. 2d 732, 738 (Cal. Ct. App. 1994) (duty of care exists to protect baseball tryout participants from aggravating sustained injuries, in part because it is "not at all unforeseeable a participant will attempt to push his body beyond its capabilities" to obtain a position on a "professional sports team"). We believe Plaintiffs' allegations are sufficient to raise a claim that the NFL undertook such a duty here.

And the breach alleged by Plaintiffs—physical harm that resulted from their premature return to play after suffering

otherwise debilitating injuries masked by over-prescription of pain-relieving medications—resembles the alleged failure on the part of USA Water Polo to "use its authority to provide routine and important safety measures" regarding return-to-play methods after an injury has been sustained. *Mayall*, 909 F.3d at 1067. *See also Wattenbarger*, 33 Cal. Rptr. 2d at 738 (returning an athlete to play after he has suffered an injury is clearly a bad idea and it "requires no depth of analysis" to reach that conclusion in the context of a voluntary undertaking claim against a professional sports team). Despite the NFL's one-step-removed relationship to the players, it was within the NFL's control to promulgate rules or guidelines that could improve safety for players across the league. *See Mayall*, 909 F.3d at 1068 (potential liability for USA Water Polo as the "rule-making authority"); *Ileto*, 349 F.3d at 1207 (holding gun manufacturers liable because they were "in the best position to protect against the risk of harm" caused by the purchase of illegal guns from all of the different sellers to whom they distributed). The TAC even alleges that the NFL has already demonstrated its ability to create better policies, regarding Toradol use for example, but has failed to enforce them.

Only one aspect of the voluntary undertaking test remains: whether the TAC includes allegations that "the actor's carelessness increased the risk of [physical] harm" to Plaintiffs. *Mayall*, 909 F.3d at 1066 (presenting increased risk as one of three options sufficient to satisfy element five). In the TAC, each player recounts the drugs he recalls being given during his NFL career and the injuries he suffered on the field that were allegedly "caused, aggravated, extended, worsened, prolonged, exacerbated, intensified, perpetuated, protracted, or made permanent by the wrongful administration of Medications to him." Plaintiffs state that some "doctors they saw after their careers concluded . . . that

some of their ailments might be the result of the amount of Medications they took during their NFL careers." Additionally, we have already previewed Plaintiffs' contention that the NFL received a medical report stating that the organization's policies regarding drug distribution create "short and long term risks of pain medication use and abuse." We conclude that these are adequate allegations that the NFL's carelessness in allowing drugs to be distributed as they were increased the risk of harm to Plaintiffs. *See id.* at 1067 (USA Water Polo "increased the risk of secondary concussions to players who improperly returned to play"). All elements of the voluntary undertaking theory of negligence have been properly pled.

Plaintiffs sufficiently allege a voluntary undertaking theory of negligence to survive a motion to dismiss, and the district court erred in its conclusion to the contrary.

C

As to their final theory of negligence, Plaintiffs argue that the TAC allegations support a claim arising out of the special relationship between themselves, as players, and the NFL. Under California law, "a duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection." *Regents of Univ. of Cal. v. Superior Court*, 413 P.3d 656, 664 (Cal. 2018). Special relationships are characterized by "an aspect of dependency" of a "limited community" of plaintiffs upon a defendant who often benefits from that relationship. *Id.* at 664–65.

As the district court pointed out, Plaintiffs failed to reference a "special relationship" even once in the TAC, and they likewise did not allude to any particular vulnerability or

dependency of their community.  We therefore reject Plaintiffs' special relationship argument.

## III

Though we conclude that Plaintiffs have properly pled a theory of negligence, we recognize that the issue of § 301 preemption under the LMRA lurks in the background.  As discussed at length in *Dent I*, the LMRA bars state-law claims "founded directly on rights created by [CBAs], and also claims substantially dependent on analysis of a [CBA]." 902 F.3d at 1116 (internal quotation marks omitted) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987)). Therefore, Plaintiffs cannot proceed with their voluntary undertaking negligence claim if it "exists solely as a result of the CBA" or requires interpretation of the agreement. *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007).  Crucially, the "nature of the plaintiff[s'] claim" governs the § 301 preemption analysis, *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir. 2001), and Plaintiffs did not expressly plead a voluntary undertaking theory of negligence in the version of the complaint that we examined in *Dent I*.

The district court did not consider whether Plaintiffs' voluntary undertaking claim is preempted.  While we have discretion to consider preemption as a question of law on appeal, we recognize that we cannot make a preemption determination with regard to the Plaintiffs' voluntary undertaking claim because we do not have all potentially relevant CBAs before us in this latest appeal. *See Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1180 (9th Cir. 2015).  We therefore remand to the district court for consideration of the preemption question as to this claim in light of the relevant CBAs and our guidance in *Dent I*.  We said there that "[t]he negligence analysis is not an equation, whereby one careless

act can be canceled out by a careful act in a related arena—especially when the careful act is to be performed by a different party." *Dent I*, 902 F.3d at 1121. The district court should examine afresh whether the NFL's general disclaimer of liability for individual players' medical treatment is relevant to the sufficiently pled allegations of the organization's inaction, where audit results demonstrate failure to safely distribute pain killers to keep marquee players in the game and maximize television revenues.

\*\*\*

We affirm the district court's determination rejecting Plaintiffs' negligence per se and special relationship theories; both were improperly pled and rightfully dismissed for failure to state a claim. We nonetheless reverse the district court's dismissal of Plaintiffs' voluntary undertaking theory of negligence because the TAC "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). We remand for the district court to determine whether the claim is preempted by the LMRA.

Each party shall bear its own costs.

**AFFIRMED in part; REVERSED in part and REMANDED.**