Filed 12/31/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JACK GREENER, | D082588 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2020-00041382-CU-PO-CTL) |
| M. PHELPS, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, James A. Mangione, Judge. Affirmed.

O'Melveny & Myers, Sabrina H. Strong, Aaron Henson; Hosp, Gilbert & Bergsten and Robert Troy Bergsten for Defendants and Appellants.

SKB Law and Susan Knock Beck; Kelly Trotter & Franzen and David Paul Pruett for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendants and Appellants.

Gordon Rees Scully Mansukhani and Don Willenburg for Association of Defense Counsel of Northern California and Nevada as Amicus Curiae on behalf of Defendants and Appellants.

Panish Shea Ravipudi, Rahul Ravipudi, Paul A. Traina, John W. Shaller; Morris, Sullivan & Lemkul, Shawn D. Morris, Michael Malady, Christian W. Barton; Niddrie Addams Fuller Singh, Rupa G. Singh and Victoria E. Fuller, for Plaintiff and Respondent.

INTRODUCTION

Jack Greener, a Brazilian jiu jitsu (BJJ) student, suffered a fractured neck and a spinal cord injury due to a series of moves his instructor, Francisco Iturralde, performed on him while sparring at Del Mar Jiu Jitsu Club (the Club), a BJJ dojo owned and operated by M. Phelps, Inc. Greener sued, alleging Iturralde was negligent and M. Phelps, Inc. (collectively, Appellants) was vicariously liable. Appellants invoked the primary assumption of risk doctrine, contending they had no duty to protect Greener from incurring these injuries in the inherently risky sport of BJJ.

The relevant jury instruction on primary assumption of risk, CACI No. 471, provides two alternative standards under which a sports instructor may be liable to an injured student. The applicable standard depends on the particular facts of each case. Option 1—the primary assumption of risk doctrine—holds an instructor liable only if the instructor intentionally injured the student or acted so recklessly that the conduct was "entirely outside the range of ordinary activity involved in teaching" the sport. Option 2—a sports-specific negligence standard—imposes liability if the instructor "unreasonably increased the risks to" the student "over and above those inherent in" the sport. (CACI No. 471.)

The court instructed the jury on option 2, finding it "most applicable for these facts." The special verdict form mirrored this instruction. Following the Directions for Use for CACI No. 471, the court also gave CACI No. 400, which states the elements of negligence. In addition, the court gave CACI

2

No. 401, which defines the basic standard of care in ordinary negligence actions. The jury, by a vote of 9 to 3, found in favor of Greener and awarded him 46 million dollars in damages.

Appellants argue the judgment must be vacated because the trial court: (1) prejudicially erred by (a) instructing the jury on CACI No. 471, option 2, and CACI Nos. 400 and 401, and (b) furnishing a verdict form based on option 2; and (2) erroneously excluded evidence, mostly about Greener's prior experience or Iturralde's teaching, which allegedly "hamstrung" Appellants' "ability to try their case."

On this record, we conclude the trial court correctly instructed the jury on option 2 of CACI No. 471 and properly used the corresponding verdict form. Although the California Supreme Court has limited liability to option 1 when "it is alleged that a sports instructor has required a student to perform beyond the student's capacity or without providing adequate instruction" (*Kahn v. East Side Union High School District* (2003) 31 Cal.4th 990, 1011 (*Kahn*)), Courts of Appeal have applied option 2 in cases where the instructor, for example, (1) "encourag[ed] or allow[ed] the student to participate in the sport when he or she [wa]s physically unfit to participate or" (2) permitted the student "to use unsafe equipment or instruments" (*Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 845 (*Eriksson*)).

While sparring with Greener during a BJJ class, Iturralde gave no demonstration or active instruction. Instead, he acted more like a student coparticipant than an instructor when he immobilized and executed a series of maneuvers on Greener. But as an instructor with superior knowledge and skill of BJJ, Iturralde was differently situated from other students, and thus he can—and we conclude should—be held to a different standard. There was evidence Iturralde knew he had created a situation posing heightened risk to

3

Greener's safety beyond that inherent in BJJ and had the time and skill to avoid that risk, yet he consciously chose to proceed. The risk an instructor will perform a maneuver on a student after immobilizing the student and knowing it will injure the student is not an inherent risk of BJJ sparring. On these facts, we conclude the trial court elected the proper standard—option 2 of CACI No. 471—under which Iturralde could be held liable. We emphasize the narrowness of our holding, which applies option 2 of CACI No. 471 to combat or grappling sports when an instructor engages in the activity while not providing any demonstration or instruction. Consistent with *Kahn*, option 1 continues to apply to the vast majority of cases in which a sports instructor is alleged to have injured a student.

Because option 2 is the ordinary negligence standard applicable to sports cases, giving the ordinary negligence instructions—CACI Nos. 400 and 401—was not technically erroneous. Nonetheless, these instructions created the possibility of confusion by providing the jury with a second, differently worded statement of the elements needed to find Iturralde liable. To the extent CACI No. 471 and CACI Nos. 400 and 401 are inconsistent, CACI No. 471, as the more specific charge, controls. As it is likely the jury followed that more specific instruction, there is no prejudicial error. Even so, we suggest the Judicial Council Advisory Committee on Civil Jury Instructions consider revising CACI No. 471 to be self-contained so as to minimize confusion and avoid the need to cross-refer to other instructions.

Finally, we conclude the trial court did not abuse its discretion in excluding certain evidence. Given Greener's theory of the case and the applicable standard of care, testimony about and videos of Greener's prior wrestling and BJJ competition experience were irrelevant. The videos of unrelated BJJ competitions were also properly excluded as cumulative and

likely to confuse. Because Iturralde testified about his approach to training Greener, any further evidence on that point was duplicative. And testimony from Iturralde's other BJJ students about the incident and their experience with him as an instructor also would have been cumulative of evidence already before the jury.

Accordingly, we affirm the judgment.

## BACKGROUND

### I.

BJJ is a grappling martial art that uses "locks, chokes, controls, and . . . scrambles"—"[w]ithout punches or kicks"—to force one's opponent to submit. BJJ is practiced both for self-defense and sport. Sport BJJ focuses on the use of specific moves to score points in competition.

There are five belt levels in BJJ: white, blue, purple, brown, and black. Everyone starts as a white belt. Promotion to the next level primarily requires consistent attendance over skill. Accordingly, students with the same belt color can have varying degrees of experience, skill, and athletic ability.

BJJ is "infinite in" the "techniques that are being developed," and there are thousands of moves and variations on them. All moves have an "inherent risk" of injury. The inherent risks are greater for some techniques than others. Injuries are "very common," particularly to the neck, knee, shoulder, and ear. They are less common in sparring than in competition.

Some BJJ moves are too "risky" and have been banned from use in competition. None of the moves Iturralde allegedly used in this incident are banned.

## II.

The Club, like most BJJ dojos in San Diego, teaches sport BJJ. Michael Phelps was the founder of and, initially, the sole instructor at the Club. Phelps later hired Iturralde as an additional instructor. Both are black belts.

At the Club, BJJ students of all belt levels take classes together. A typical class at the Club starts with a warm-up, progresses to learning new techniques, and ends with sparring, when rotating pairs of students and instructors practice techniques on one another in a manner similar to, but less intense than, competition.

During sparring, partners may use unfamiliar moves on one another, and it is "not customary" to tell one's partner one's next move. According to Clark Gracie, Appellants' BJJ expert, sparring is an opportunity to learn moves, how to defend against them, and how to anticipate them. Rener Gracie, Greener's BJJ expert, disputed the effectiveness of sparring as a "learning method," as "you rarely remember what just happened to you" "in the heat of sparring."

At trial, Iturralde and Phelps testified that, as BJJ instructors, they seek to "minimize risk" as a best practice. Both said safety is their top priority, and Iturralde stated he, as the instructor, is responsible for his students' safety. According to Iturralde, he "can see multiple steps ahead." So, when sparring as an instructor, he "put[s] the person in the position where they can choose different reactions, and [he is] ready for those reactions."

## III.

Greener started learning BJJ in 2015 and was a white belt at the time of the incident. He attended BJJ classes at a different dojo roughly twice a

6

week for two to three months.  He stopped attending classes there because it was too far away.

About a month later, he began training at a second dojo.  He attended classes two to five times per week and sparred, including with black-belt instructors.  He also competed in four or five competitions, winning two.

Greener attended one "open mat" session at the Club in April 2018 because it was closer to his home.  He did not return for six or seven months.  In early November 2018, Greener began taking classes at the Club, sometimes sparring with Phelps and Iturralde.

Later that month, Greener sparred with Iturralde at the end of one of Iturralde's classes.  Greener was in the "turtle position" with his elbows and knees on the floor, his back to Iturralde, and his head tucked.  Iturralde used a transitional maneuver to hold Greener.  While executing another transitional maneuver to make Greener submit, Iturralde lost control and injured Greener.  The parties stipulated Greener did "nothing wrong" and the jury was not to consider contributory negligence.

Videos of the incident were admitted as evidence at trial.  We reviewed the version included in the appellate record, in which Iturralde's arms and Greener's left arm and head are colorized to assist the viewer in seeing their placement and movement.  Greener has not seen the videos and has no independent recollection of the moves resulting in his injury.

IV.

At trial, the parties gave conflicting testimony about (1) what Iturralde knew of Greener's BJJ background and goals, and (2) how that knowledge influenced his training of Greener.

Greener testified to speaking with Phelps about his past BJJ experience, including where he trained and his desire to "learn."  He

7

"th[ought]" he told Phelps he had competed previously and wanted to continue doing so. Greener does not recall if he had a similar conversation with Iturralde, whom he described as "aloof."

Iturralde testified that when Greener started at the Club, they spoke "about prior experience, where he trained before, what injuries maybe he had, and maybe what goals he had training Jiu-Jitsu." He understood Greener had "probably six months of training" in BJJ. According to Iturralde, Greener's "desire of continuing to compete" was "clear," although there was no evidence Phelps shared with Iturralde what Greener told him about his previous competition experience and desire to continue. Greener's goal of competing and winning influenced how Iturralde approached Greener's training.

According to Iturralde, he "can tell [a] person's expertise" by observing the person sparring. From seeing the person's stance, demeanor, and intensity, he can assess a person's experience in "about a minute." Based on "the way [Greener] moved, the way he entered, the techniques that he applied on other individuals," and his ability to "just get it," Iturralde perceived Greener to be a "highly skilled practitioner." When sparring together, Greener "trie[d] more elaborative [sic] techniques with a higher successful rate [sic]," signaling he was "a lot more skilled" than a typical white belt and "very experienced."

V.

The evidence at trial conflicted greatly as to the moves Iturralde executed on Greener at the time of the incident, their propriety, and whether Iturralde could have changed course once he realized—as he himself testified at trial—"something bad was going to happen" to Greener.

8

## A.

Iturralde called the first move he performed on Greener—which involved placing his left arm around Greener's left bicep and his right arm below Greener's right armpit, then clasping his hands together over Greener's chest—a "tight seat belt" grip. He testified a seat belt grip should have one arm "over either [a] bicep[ ], shoulder, a trap[ezius]"—"anywhere in this area"—and the other "under the opposite armpit."

When shown the colorized video frame by frame, Iturralde first testified he "intend[ed] to position" his left arm "over [Greener's] shoulder." As the video progressed, however, he acknowledged his arm was "not over [Greener's] shoulder" but "on the side of" it. He thought his "arm slipp[ed] during execution." Iturralde acknowledged that when a seat belt grip is applied over a person's arm rather than the shoulder, the person "cannot use that arm at all" and "cannot protect" themself with that arm.

Nonetheless, Iturralde claimed he had "just as much control" over Greener's head and neck with his arm over Greener's bicep as over his shoulder. When asked if a "properly" applied seat belt grip resulted in "total control over [the other person's] head and neck," Iturralde responded, "Yes." Later, however, Iturralde said it is "impossible to have control" over the person's head and neck unless one "appl[ies] a choke" hold, which was not so here. So, he admitted "[a]t no point" did he "ha[ve] control of [Greener's] head and neck."

Iturralde called the second maneuver he performed on Greener "a back take from the turtle position" or "a rolling back take." He testified "the intention of the move is [to] take the person diagonally. So I'm trying to roll the person over their shoulder." Iturralde used the move "daily"—

9

"thousands" of times—and was fairly certain he had used it multiple times on Greener.

According to Iturralde, the second move, if improperly executed, is "dangerous." He would not execute it if he "could not safely" do so. He agreed he "should not even execute that move" absent control. Yet Iturralde admitted he lost control of Greener's head and neck as well as himself, and Greener was injured as a result. Iturralde admitted his head did not "stay in the appropriate spot during the execution of the technique." Nonetheless, Iturralde maintained "the move was applied correctly."

Iturralde testified Greener's experience level was "not relevant" when "executing the technique." On cross-examination, however, Iturralde clarified he would vary the speed with which he performed the second move depending on the other person's experience level and modify the intensity and strength he applied based on size and age. The other person's "resistance" would also affect his decision-making while performing the move. He would be "more forgiving" with someone "fresh off the street" but "less forgiving" with "someone more skilled" so "they will learn."

Here, Iturralde did not attempt the second move right away, but instead took "a pause" "to give [Greener] an opportunity" to "escape" the grip. Iturralde admitted that once he started the second move and picked up momentum by kicking his right leg in the air, but while he still had his left foot on the ground, he "realize[d] there was already a bad outcome" and "something bad is happening to [ ] Greener." He initially conceded he "could let go" instead of executing the second move and "face-plant to the ground." But he later claimed it was too late to prevent Greener's injury because he was "already committed to the [second] move." Even just a few frames earlier in the video, however, Iturralde said there was still time to let go.

10

## B.

Like Iturralde, Phelps testified the first move was a seat belt grip and the second a rolling back take.  Later, however, he called the first move a "body lock" or a seat belt that "transitioned to a lap belt."  Nonetheless, "in [his] opinion, [the move] was still extremely safe in how [Iturralde] was applying it."

According to Phelps, "[t]here are many ways to do" a seat belt grip.  Yet he agreed that when a seat belt grip goes over the shoulder and against the neck, "you protect the neck and you protect the head, because the head and neck are cradled in the person on top's shoulder."

A video of a typical sparring session created by Appellants and admitted at trial showed a student performing a seat belt grip on his partner, followed by the instructor correcting and demonstrating the move.  Each time the instructor executed the grip, he had his arm over the student's shoulder, using it to control the student's head.  Phelps admitted while watching the video that had Iturralde performed his seat belt grip in that manner, "[t]here would [have been] less risk" of harm to Greener's neck and head.

## C.

Greener's BJJ expert, Rener Gracie, testified a "proper" seat belt grip, "much like a seat belt in a car," involves a user who "locks their hands around the torso of the student . . . , and one arm is coming over the shoulder"—"as close as you can get to the neck without actually going around the neck"—and "one arm is coming under the armpit on the opposite side, and then the hands are generally united in the chest area of the" student.  A seat belt grip so employed is "a very, very dominant, controlling grip," "[b]ecause your bicep . . . is very, very closely connected to their neck and your other arm is tightly

11

under their opposite armpit and your hands are connected," with one's head "very close to [the student's]" so one can "own[ ]" the "neck area."

In analyzing the incident video frame by frame, Rener opined Iturralde's grip on Greener was "not an incorrect seat belt grip as much as it was simply not a seat belt grip." He had "never seen" a seat belt grip so applied. Nor was the grip a "body lock," where both arms would be around the trunk. Rener disputed Iturralde's claim that his grip slipped, as he observed "a sustained grip" that was "well maintained throughout."

According to Rener, the "incorrect" and "unconventional" grip Iturralde used on Greener resulted in him having "no control over [Greener]'s head and/or neck." "Because that arm comes down and is around the—we'll call it bicep/tricep, just above the elbow of the [student], the control has shifted away from the head and neck and down to . . . the [student]'s arm." He demonstrated for the jury how an instructor with their arm around the bicep, rather than over the shoulder, has no control of the student's head or neck while simultaneously taking away control of the student's arm, which "might otherwise help support some weight and prevent injury." Iturralde thus "lost control from the very beginning" over Greener's head and neck.

Rener opined "an expert of Iturralde's level . . . would know that by the arm being bound the way it is, and the head not being controlled in any way, any forward pressure or momentum would be directed toward the subject's head," which "would certainly fall under the unreasonable and increased risk category." Other issues further exacerbated the risk. Iturralde's head was not "directly next to" Greener's "in the way that it would have been if [the move] were done correctly." And while a tight grip can sometimes prevent injury, here—given Greener's pinioned arm—"[t]he tight grip is actually what exacerbated the likelihood of injury."

12

Rener called the second move a "forward flip." But he likewise had never seen that move performed or taught in the manner Iturralde used.

In Rener's opinion, Iturralde "should have understood that the position of his arms was inaccurate or incorrect from the beginning and not even attempted" the second move. Once he knew he had neither a seat belt grip nor a body lock, but instead a "hybrid control" presenting "the highest degree of risk," "he had a choice to change the application of the technique." Iturralde could have released the grip entirely, changed it to be "correctly applied," or "change[d] course and do[ne] a completely different technique." Rener could not "think of a technique to be deployed at this point that would be riskier than the one [Iturralde] used."

Even at the point of the maneuver when Iturralde conceded he had lost control and knew something bad would happen, Rener believed Iturralde could have avoided injuring Greener. According to Rener, Iturralde could have "simply release[d] the grip," at which point Iturralde "would have just safely rolled right out of it" and Greener would "no longer bear . . . two men's body weight on [his] head and neck, and there would be no injury." Instead, Iturralde made a "choice to maintain that tight grip, restricting [Greener]'s arm." In short, Iturralde "proceeded to apply the technique very intensely and very committedly with all the momentum of his body in a way that gave the recipient no opportunity to safely surrender to the technique," which in Rener's opinion "is where the highest level of unreasonable risk was presented to the student."

D.

Appellants' BJJ expert, Clark Gracie, testified the first move was a seat belt grip, with nothing "improper" about Iturralde's positioning. He opined a seat belt grip with one arm "around the upper shoulder bicep region" is still

13

recognized as a legal move.  In his view, Iturralde's hold on Greener was "reasonably safe."

Clark called the second move a "[f]ront roll back take."  He said the move was "common," and he had seen it "at least a hundred times."  According to him, "nothing say[s Iturralde] should not be able to use that move" on a white belt student.

Clark opined there was nothing Iturralde did to "increas[e] the risk of injury from this particular move."  Iturralde's head and other body parts were in proper position, even at the point that Iturralde testified he lost control.  In fact, in Clark's view, Iturralde never lost control over Greener.

During cross-examination, however, Clark admitted "you're unable to control the person's head in this technique," so Iturralde never had control of Greener's head and neck.  He also admitted Iturralde could have let go and either rolled to the side or face-planted when both his feet were still on the ground.

### E.

Another Club student present the day of Greener's injury testified he had never seen a rolling back take performed as shown in the video of the incident.  He was not "taught to be that athletic in that move" and had never performed it that way.  He had never witnessed Iturralde teach the move in that manner.

### DISCUSSION

### I.

As an initial matter, the parties' arguments, as well as our analysis, are heavily influenced by Greener's theory of liability in the trial court, a highly disputed issue on appeal.  On the one hand, Appellants insist Greener's theory of liability at trial was the "novice theory"—that he was

14

injured by his black-belt instructor while training because he "was allegedly an inexperienced novice" who Iturralde "pushed" to "engage in" an advanced, rare, and highly dangerous move that should not be used in training and for which he was unprepared. Greener, on the other hand, contends his theory of liability was the "improper technique theory"—"that Iturralde unilaterally chose to perform a dangerous technique on Greener . . . incorrectly, beginning with an incorrect grip," and "ignored opportunities to abandon the maneuver . . . despite admitting to losing control . . . and knowing 'something bad' was about to happen."

We conclude the record establishes Greener's theory of liability at trial, as on appeal, was the improper technique theory. Although Greener appears to have pursued the novice theory pretrial, by the time the parties discussed the scope of opening statements, Greener disclaimed pursuing a theory premised on skill. Consistent with that remark, the first two days of testimony focused on technical aspects of the moves Iturralde performed on Greener. As detailed above, Iturralde, Phelps, Rener, and Clark testified consistent with addressing the improper technique theory.

Additionally, Appellants unsuccessfully tried to bar Greener's BJJ expert from testifying about how Iturralde performed the relevant moves, claiming he only testified to the novice theory in his deposition. After reviewing the relevant portions of Rener's deposition transcript, the court overruled the objection. Although some of Rener's opinions at trial continued to support the novice theory, in his own words, his "ultimate opinion" was "that a[n] expert practitioner of the art . . . incorrectly applied a technique, . . . [a]nd when he had a choice to change the application of the technique . . . , he failed to make that choice," instead "proceed[ing] to apply the technique very intensely and very committedly . . . in a way that gave the

15

recipient no opportunity to safely surrender." By doing so, Iturralde exposed Greener to "the highest level of unreasonable risk."

We thus disagree with Appellants' claim that the improper technique theory was "made up entirely for this appeal." Even so, Appellants are correct that Greener's counsel argued the novice theory to some degree during closing arguments—an issue we address below.

In sum, we conclude Greener pursued the improper technique theory at trial, and we analyze the parties' claims accordingly.

## II.

Having dispensed with this threshold issue, we turn to Appellants' claim of instructional and verdict form error.

We review purported instructional and verdict form errors de novo. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 831; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.) We generally presume the correctness of the trial court's judgment. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) If we identify any errors, however, we assess any resulting prejudice in a manner deferential to the appellant (*Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 525), "view[ing] the evidence in the light most favorable to" it (*Bourgi v. West Covina Motors, Inc.* (2008) 166 Cal.App.4th 1649, 1664).

## A.

Throughout the case, the parties contested the scope of the duty of care Iturralde owed Greener. Because the issue was pertinent to "the statement of the case" at the start of trial as well as trial presentation generally, the parties sought a pretrial decision from the court on this issue.

The doctrine of primary assumption of risk "generally absolves" sports instructors of a duty of care toward their students "with regard to injury

16

incurred" during the sporting activity.  (CACI No. 471 Directions for Use.)  In some situations, however, a sports instructor nonetheless owes a student a duty of care.  CACI No. 471 provides two alternative standards.

Under option 1, a sports instructor owes a duty if he or she "intended to cause [*name of plaintiff*] injury or acted recklessly in that [*his/her/nonbinary pronoun*] conduct was entirely outside the range of ordinary activity involved in teaching or coaching [*sport or other recreational activity, e.g., horseback riding*] in which [*name of plaintiff*] was participating."  (CACI No. 471.)  This standard governs in "cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury." (*Kahn, supra*, 31 Cal.4th at p. 996.)

Under option 2, a sports instructor owes a duty if the instructor "unreasonably increased the risks to [*name of plaintiff*] over and above those inherent in" the sporting activity.  (CACI No. 471.)  The Directions for Use tell the court to use this option if the sports instructor's alleged "failure to use ordinary care increased the risk of injury to the plaintiff, for example, by encouraging or allowing the plaintiff to participate in the sport or activity when the plaintiff was physically unfit to participate or by allowing the plaintiff to use unsafe equipment or instruments."  (Citing *Eriksson, supra*, 191 Cal.App.4th at p. 845.)  The Directions for Use further provide the court should "also give CACI No. 400"—the ordinary negligence instruction—"[i]f the second option is selected."

1.

Pretrial, Appellants' counsel argued only option 1 applied on the facts of the case, while Greener's counsel contended option 2 governed.  The court

ultimately concluded option 2 was "most applicable" and "more akin to the facts that we have." Greener's counsel then alerted the court that CACI No. 471's Directions for Use indicate "we're supposed to give CACI [No.] 400 with it," which in his view would "define 'unreasonably'" in CACI No. 471, option 2.

Midway through trial, based on CACI No. 471's Directions for Use, the court said it "plan[ned] to give [No.] 400. And if I give [No.] 400, then [No.] 400 is going to tell me, I believe, that I should be giving [No.] 401." This prompted Appellants' counsel to claim "this has now become a negligence case when it's a primary assumption of the risk case." Greener's counsel explained "primary assumption of risk [is an] exception[ ] to the bar on negligence. So it is a negligence case . . . under the exception," and option 2 "is an enhancement of" CACI No. 400. The court agreed with Greener's counsel.

When finalizing the instructions, Appellants' counsel again advocated for option 1 without CACI No. 400. Greener's counsel argued nothing had changed as to the propriety of option 2, and "CACI [Nos.] 400 and 401, it's the directions in the use note, and so that's . . . why [they] should be given." The court stated, "as I've indicated earlier . . . , I don't think this case falls clearly within a box which makes it easy on the [c]ourt to choose one or the other, but I believe this case is more akin to" option 2. Thus, "per the use notes, I am going to give CACI [No.] 400." The court confirmed it would give CACI No. 401 as well.

As to the verdict form, Appellants' counsel contended the proposed form—modeled on VF-404, the form for CACI No. 471—"assumes that reasonable care was not used," so "[t]here needs to be a determination of whether or not there was negligence in the first place. And that's the

18

[VF-]400" form, the form for CACI No. 400.  Greener's counsel disagreed, contending "VF[-]404 was crafted to encapsulate the questions that the jury needs to answer" and "was drafted th[at] way . . . for a reason."  The court agreed with Greener's counsel.

2.

Ultimately, the court instructed the jury on CACI Nos. 400, 401, and 471, option 2, and the special verdict form followed VF-404.

CACI No. 400, as given, provided: "Greener claims that he was harmed by [ ] Iturralde[ ]'s negligence.  [¶]  To establish this claim, [ ] Greener must prove all of the following: [¶] 1. That [ ] Iturralde [ ] was negligent; [¶] 2. That [ ] Greener was harmed; and [¶] 3. That [ ] Iturralde['s] negligence was a substantial factor in causing [ ] Greener's harm."

CACI No. 401, as given, provided: "Negligence is the failure to use reasonable care to prevent harm to oneself or to others.  [¶]  A person can be negligent by acting or by failing to act.  A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.  [¶]  You must decide how a reasonably careful person would have acted in [ ] Iturralde[ ]'s situation."  This instruction immediately followed CACI No. 400.

The court then gave CACI No. 430 on causation, followed by CACI No. 471, which, as given, provided: "It is established that [ ] Iturralde [ ] was [ ] Greener's instructor at all relevant times.  [ ] Greener claims he was harmed by[ ] Iturralde[ ]'s coaching, training, and/or instruction.  To establish this claim, [ ] Greener must prove all of the following: [¶] 1. That [ ] Iturralde [ ] was [ ] Greener's instructor; [¶] 2. That [ ] Iturralde [ ] unreasonably increased the risk to [ ] Greener over and above those inherent in Brazilian

19

Jiu Jitsu sparring; [¶] 3. That [ ] Greener was harmed; and [¶] 4. That [ ] Iturralde[ ]'s conduct was a substantial factor in causing [ ] Greener's harm."

As relevant here, the special verdict form asked: "Did [ ] Iturralde [ ] unreasonably increase the risk to [ ] Greener over and above those inherent in Brazilian Jiu Jitsu sparring?" The jury marked "Yes." When polled, nine of the twelve jurors reported their answer was "Yes."

B.

In general, a person who fails to exercise "ordinary care" is responsible for any resulting injury to another. (Cal. Civ. Code, § 1714, subd. (a).) In the sports context, "it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315–316 (*Knight*).)

In *Knight*, however, a plurality of the California Supreme Court eliminated liability for negligence "[i]n some situations" where "the careless conduct of others is treated as an 'inherent risk' of a sport." (*Knight*, *supra*, 3 Cal.4th at p. 316.) Courts must decide when such carelessness "is assumed by the injured participant" such that recovery for such negligence is barred by the "'primary assumption of risk' doctrine." (*Id*. at pp. 314–316.) "[R]esolution of the question of the defendant's liability in such cases turns on whether the defendant had a legal duty to avoid such conduct or to protect the plaintiff against a particular risk of harm." (*Id*. at pp. 316–317.) "[T]he nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself," and "the scope of the legal duty owed . . . frequently will also depend on the defendant's role in, or relationship to, the sport." (*Id*. at p. 317.) The "question of the existence and scope of a

20

defendant's duty of care is a *legal* question . . . to be decided by the court." (*Id.* at p. 313.)

In *Knight*, the plaintiff was injured by a coparticipant during a game of touch football. (*Knight, supra,* 3 Cal.4th at p. 318.) The court concluded "vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct." (*Ibid.*) The court thus held a coparticipant can be liable "only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320.)

Subsequently, in *Kahn*, a Supreme Court majority extended *Knight*'s "intentional or reckless" standard to "cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student." (*Kahn, supra,* 31 Cal.4th at p. 996.) Although "the relationship of a sports instructor or coach to a student or athlete is different from the relationship between coparticipants," "a significant part of an instructor's or coach's role is to challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks," which "could be improperly chilled by too stringent a standard of potential legal liability." (*Ibid.*)

Nonetheless, *Kahn* did not foreclose holding instructors to a negligence standard in other factual contexts. Instead, it emphasized that "[d]uties with respect to the same risk may vary according to the *role* played by particular defendants." (*Id.* at p. 1004.) *Kahn* was careful to recognize *Knight*'s intentional or reckless standard "*generally* should apply to sports

21

instructors"—"keeping in mind, of course, that different facts are of significance in each setting." (*Id.* at p. 1011, italics added.) Indeed, it echoed *Knight*'s statement that defendants in sports liability cases "generally do have a duty not to increase the risk of harm beyond what is inherent in the sport." (*Id.* at p. 1004.) In other words, where primary assumption of risk does not limit liability to the "intentional or reckless" standard, a sports-specific negligence standard applies—the "increased risk" standard.

Since *Kahn*, in select situations courts have continued to apply *Knight*'s baseline "increased risk" standard—option 2 of CACI No. 471—in sport instructor liability cases.

For example, in *Eriksson*, a different division of this district reversed summary judgment in favor of a riding coach, concluding she owed a duty to not increase the inherent risks of cross-county horseback competition by permitting her student to ride an unfit horse. (*Eriksson*, *supra*, 191 Cal.App.4th at p. 830-831.) The student's horse had been injured in a competition several weeks earlier, but the instructor assured the student's mother the horse was "'good'" to compete. (*Id.* at pp. 832, 834–835.) The horse threw the student, fell on top of her, and killed her. (*Id.* at p. 836.) Although being thrown off a horse during competition is an inherent risk of cross-country horse riding, the Court of Appeal concluded the increased risk standard of care applied because (1) the coach was responsible for deciding if the student's horse was fit to compete, (2) the mother relied on the coach's expertise, and (3) the coach "had the ability to control whether the horse participated." (*Id.* at pp. 846–847.) The Court of Appeal relied on several cases predating, but consistent with, *Kahn*'s holding. *Eriksson* sorted the existing case law applying the increased risk standard into two groups: coaches who increased the risk of injury by (1) "allowing the student to use

unsafe equipment or instruments" or (2) "encouraging or allowing the student to participate in the sport when . . . physically unfit." (*Id.* at p. 845.)

As to "unsafe equipment" cases, *Eriksson* noted both *Tan v. Goddard* (1993) 13 Cal.App.4th 1528 (*Tan*) and *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817 (*Galardi*) also involved equestrian coaches who directed their students to ride a horse in a particular manner. The coach in *Tan* knew the horse was injured and "'off'" yet assigned the student to ride the horse in a manner not safely achievable given the horse's condition. (*Tan*, at pp. 1531, 1534–1536.) And in *Galardi*, the student's instructor raised the height of obstacles without changing the distance between them and instructed the student to ride the course in reverse. (*Galardi*, at p. 820.) Both students were injured. (*Galardi*, at p. 820; *Tan*, at p. 1531.) In both cases, the Court of Appeal reversed summary judgment in favor of the coaches based on primary assumption of risk, finding triable issues of fact. (*Galardi*, at p. 824; *Tan*, at pp.1535–1536.)

*Eriksson* squared these decisions with *Knight* through *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525 (*Bushnell*). (*Eriksson*, *supra*, 191 Cal.App.4th at pp. 842–843.) In *Bushnell*, the Court of Appeal concluded a student injured while practicing a judo move with his instructor in a progressively more demanding manner was barred from recovery by *Knight*. (*Bushnell*, *supra*, 43 Cal.App.4th at pp. 528–529.) "Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities," because "[t]o hold otherwise would discourage instructors from requiring students to stretch, and thus to learn, and would have a generally deleterious effect on the sport." (*Id.* at p. 532.) While *Bushnell* disagreed

23

with *Tan* and *Galardi* to the extent they may have suggested "an instructor always owes a duty of care to his or her students," it concluded they were right that instructors can be liable if they increase the risks inherent in riding by "[f]ailing to provide a fit animal and a safe track" and "fail[ing] to provide a safe environment," respectively. (*Id.* at pp. 532–534.) In *Kahn*, our high court acknowledged without criticism *Bushnell*'s examination of *Tan* and *Galardi*. (*Kahn, supra*, 31 Cal.4th at pp. 1007–1008.)

As to physically unfit students, *Eriksson* cited *Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746 (*Wattenbarger*), which also reversed summary judgment in favor of a defendant who invoked primary assumption of risk. (*Eriksson, supra*, 191 Cal.App.4th at pp. 844–845.) In *Wattenbarger*, a student trying out for a major league baseball team felt his arm "'pop'" during a pitch. (*Wattenbarger*, at p. 750.) The student told the team's personnel, who failed to respond. The student returned to the mound, threw a pitch, and suffered an injury. (*Ibid.*) The Court of Appeal reasoned the first injury was simply an inherent risk of pitching, but team personnel owed a duty not to increase the risk of aggravating the initial injury by permitting the student to continue pitching after he impliedly sought their guidance. (*Id.* at pp. 753–756.)

More recently, *Mayall v. USA Water Polo, Inc.* (9th Cir. 2018) 909 F.3d 1055 (*Mayall*) reaffirmed *Wattenbarger*'s reasoning, holding a water polo coach owed a duty to a student returned to play in a tournament after being hit in the face who then suffered additional hits to the head that caused further harm. (*Id.* at p. 1058.) The court reasoned the student's "coach knew that she had been hit in the head, had time to evaluate her, and knew or should have known that returning her to play had the potential of

24

significantly exacerbating her injury," thus potentially increasing the inherent risks of injury. (*Id*. at p. 1063.)

While thus far courts have applied the increased risk standard to only the two rough categories of cases identified above, the standard is not limited to such cases. As noted above, *Kahn* did not foreclose holding instructors to a different standard of care in other factual contexts, and Appellants concede *Eriksson*'s groupings are merely examples of when the increased risk standard may appropriately be applied. Thus, Appellants' reliance on an isolated sentence from the introduction of *Kahn* to suggest the reckless or intentional standard applies to *all* sports instructors does not persuade us.

In short, the general rule is that a defendant in a sports liability case owes a duty to the plaintiff not to "increase the risks to [the plaintiff] over and above those inherent in the sport." (*Knight*, *supra*, 3 Cal.4th at pp. 315–316.) The Supreme Court has, however, declared that the doctrine of primary assumption of risk bars liability for negligence in many instances. In coparticipant cases, negligence is simply inapplicable; a defendant can be liable only if they "intentionally injure[ ] another player or engage[ ] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id*. at p. 320.) The same standard applies to an instructor defendant in "cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student." (*Kahn, supra,* 31 Cal.4th at p. 996.) Where the primary assumption of risk doctrine does not apply because there is not the same risk of chilling vigorous participation,

25

however, the default sports duty not to unreasonably increase risk applies.[1] (See, e.g., *Eriksson*, *supra*, 191 Cal.App.4th at pp. 845–847.)

The question, then, is whether this case falls within the category of cases to which *Kahn* applied a higher standard—in which case the jury should have been instructed on option 1 of CACI No. 471—or not—in which case the jury was properly instructed on option 2.

### C.

Appellants claim the trial court prejudicially erred by instructing the jury on (1) option 2, rather than option 1, of CACI No. 471, and giving the corresponding special verdict form; and (2) CACI Nos. 400 and 401 in addition to CACI No. 471. We conclude the court properly instructed the jury.

### 1.

### a.

The increased risk standard applies to the facts before us.

In his own words, Iturralde was a "highly skilled practitioner" of BJJ with "expertise in this field." Iturralde acknowledged his responsibility as a BJJ instructor for his students' safety, which he described as his top priority. He agreed that to increase risks to a student is something he "tr[ies] to avoid . . . at all costs." According to Iturralde, he had the skill and experience to anticipate his students' moves while sparring and ensure he was able to

---

[1] We recognize that existing cases disagree as to whether the increased risk standard is an ordinary negligence standard or a heightened standard requiring recklessness, or something between the two. (See generally Hnylka, *California Drops the Ball: The Lack of a Clear Approach to Recklessness in Sport Injury Litigation* (2011) 11 Va. Sports & Ent. L.J. 77 [noting confusion in California case law as to what increased risk standard encompasses].) We agree with Appellants that it is the ordinary negligence standard tailored to sports cases.

respond with control to their maneuvers. He "know[s] what the risk" of a given move is because he is "planning in a way to minimize the risk." According to Iturralde, a BJJ instructor should not execute a move unless he has control over himself and the student. To execute a move without adequate control would be unsafe, be unreasonable, and increase risk.

Although disputed, evidence before the jury showed Iturralde unilaterally used an improper grip that provided inadequate, if any, control of Greener's head and neck to safely perform his intended maneuver, thus increasing the risk of neck and head injury beyond that inherent in BJJ sparring. There was evidence Iturralde had sufficient skill, experience, and time to know his grip was improper and unsafe. Further, Iturralde testified he knew, arguably before it was too late to avoid dangerously increasing the risk of injury to Greener, that "something bad was going to happen" to Greener if he proceeded. Yet rather than release his grip, adjust his grip, or achieve his objective of taking Greener's back using a move less impactful on Greener's head and neck, Iturralde instead consciously proceeded with the now dangerously risky maneuver he originally planned to use. As a result of that choice, he seriously injured Greener.

Many of Appellants' initial arguments against option 2 of CACI No. 471 rely on their misapprehension of Greener's theory of liability, which we addressed above. And to the extent Appellants attack the trial court's reasons for giving option 2, we need not address that issue, as "a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning." (*Green v. Superior Court* (1985) 40 Cal.3d 126, 138.)

In their reply brief, Appellants claim Greener's improper technique theory "is mere semantics" such that *Kahn* still controls. But Appellants overlook the role of the *student's actions* in *Kahn* and its progeny. (See *Kahn*,

27

*supra*, 31 Cal.4th at p. 996.)  Here, Greener was not injured due to a move *he* was challenged or directed to perform; instead, he was injured by his *instructor's* unilateral choices to immobilize him and apply moves which now unacceptably increased the risk of injury to him.  These facts distinguish this case from *Kahn*, where the instructor forced the *student* to perform a skill without training.  (*Id.* at p. 998.)

The myriad cases cited by *Kahn* that Appellants reference in their opening brief—mostly in a footnote string cite—are likewise factually inapposite.  For example, in *Bushnell*, a judo student was practicing a move with his instructor, who was gradually increasing the speed with which he responded to the student's move, allegedly causing the student to fall and break his leg.  (*Bushnell*, *supra*, 43 Cal.App.4th at p. 528.)  Unlike here, there was no "evidence of recklessness, or other risk-increasing conduct," on the instructor's part.  (*Id.* at p. 532.)  In *Lilley v. Elk Grove Unified School Dist.* (1998) 68 Cal.App.4th 939, a wrestling coach broke a student's arm while demonstrating a move on him, but there was no indication the coach did anything to increase the inherent risk of injury the correctly applied move presented.  (*Id.* at pp. 942, 944.)  In *Rodrigo v. Koryo Martial Arts* (2002) 100 Cal.App.4th 946, a Tae Kwon Do instructor told his students to line up for a drill and stand still without practicing their moves, thereby *decreasing* the risk a student would be injured by another student's kick.  (*Id.* at pp. 957, 960–961.)  And in *Honeycutt v. Meridian Sports Club, LLC* (2014) 231 Cal.App.4th 251, a student injured her knee when her kickboxing instructor assisted her in correcting her improper kick, but allegations of risk-increasing behavior were absent.  (*Id.* at pp. 254, 258).

We evaluated each of the remaining cases Appellants cite, and all are distinguishable for similar reasons.  These cases are thus unpersuasive on

the facts before us, as here the evidence showed Iturralde's actions *did* increase the inherent risks of injury in BJJ sparring to Greener.

All these cases also involve situations in which the instructor was acting as an instructor. That is not so here. In BJJ sparring, a student may be practicing important BJJ skills, but the sparring itself is the same whether with the instructor or a fellow student. During BJJ sparring, no one is demonstrating a move, instructing another to perform a move, or discussing moves or errors as they occur. While a regular coparticipant would be held to the intentional or reckless standard in this context under the primary assumption of risk doctrine, an instructor—responsible for the safety of their students and possessing superior knowledge and skill—is differently situated. It is not an inherent risk of BJJ sparring that an instructor will perform a maneuver on a student knowing the student will be injured. On these facts, Iturralde can appropriately be held to the increased risk standard.

To the extent Greener's counsel, during closing arguments, invoked the novice theory—claiming there were "three separate[,] independent reasons" Iturralde was liable to Greener, one being that "he utilized a dangerous technique" that "should not have been done on a novice white belt like" Greener—we conclude this line of argument did not render the court's instruction on option 2 erroneous. The court had already instructed the jury before closing arguments. At that time, the trial court had properly determined this case was distinguishable from *Kahn* and more akin to *Tan*, *Galardi*, and *Wattenbarger*, so it rightly instructed the jury on option 2. Insofar as Greener's counsel revived the novice theory at the post-instruction stage, the onus was on Appellants to object to the improper argument and seek a curative instruction. (*Saret-Cook v. Gilbert, Kelly, Crowley & Jennett*

(1999) 74 Cal.App.4th 1211, 1230.) Having failed to do so, and with no indication "an objection and admonition would not have cured the prejudice," any claim of error based on that closing argument is forfeited. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 599.)

b.

We further conclude applying the increased risk standard *on this record* has no adverse public policy implications.

Greener contends "[n]o one would learn Jiu-Jitsu if a risk inherent in attending class was that an instructor could break a student's neck by incorrectly using a dangerous technique over safer alternatives and refusing to abandon it when he lost control." Imposing liability would therefore "protect[ ] the martial art's integrity" rather than "chill[ ] vigorous participation."

Appellants, meanwhile, claim Greener "asks this Court to adopt a general rule stating that a coach can be held liable if he performs a move on a student that a jury later finds to be unreasonably dangerous or that the coach, in hindsight, could have performed less dangerously," and such a rule "would pose serious risks to the continued vitality of a sport like BJJ." Their amici curiae—Association of Southern California Defense Counsel and Association of Defense Counsel of Northern California and Nevada (collectively, Amici)—urge that "[w]atering down the standard for liability, or creating a 'novice' exception to the assumption of risk," would "possibly force schools to eliminate some or all sports completely based on funding," as "[i]ncreased litigation and resulting judgments" would lead to "increased claims" to insurers, which in turn would cause "increased premiums and perhaps even an elimination of coverage."

Contrary to Appellants' and Amici's claims, neither the trial court's nor our decision eliminates any move as inherently unsafe or endorses a "rule that would hold a coach liable anytime he could have performed any move in a less dangerous way." Nor do we adopt a novice exception or "water[ ] down" the standard of care. We agree with Appellants and Amici that doing so could "alter fundamentally" the nature of BJJ and chill "vigorous participation" in the sport. (*Knight*, *supra*, 3 Cal.4th at p. 318.)

Rather, we apply the already extant increased risk standard to the facts "in line with the underlying policy" of primary assumption of the risk. (*Eriksson*, *supra*, 191 Cal.App.4th at p. 845.) Although an instructor does not "always owe[ ] a duty of care to his or her students and thus become[ ] an insurer of their safety" (*Bushnell*, *supra*, 43 Cal.App.4th at p. 532), the primary assumption of risk case law is clear that instructors appropriately can be held liable under a different standard of care than coparticipants (*Kahn*, *supra*, 31 Cal.4th at p. 1004; *Eriksson*, *supra*, 191 Cal.App.4th at p. 845). As Rener aptly noted, there is a difference between "a master of the art" who is "the instructor of the class" engaging with a student on the one hand and a student interacting with another student on the other.

We discern no chilling effect from imposing liability on the record before us. As in *Galardi*, *Tan*, *Wattenbarger*, and *Eriksson*, Iturralde exercised his superior expertise and judgment in a manner he knew unreasonably increased the risk Greener would be injured in BJJ sparring. Unlike a fellow student still learning BJJ, Iturralde appreciated the likely bad outcome of his actions, yet he opted to proceed rather than change course. As Rener testified, if this "was acceptable conduct by a[n] expert black belt instructor in the industry of Brazilian jiu jitsu, it would have a negative long-term effect on attracting people to this art." Upholding liability

31

in this case is consistent with the public policy concerns of *Knight* and its progeny.

We read the dissent as taking an overly expansive view of what we hold today. The dissent decries the chilling effect our holding would have on "*hands-on instruction* through coparticipation" in inherently dangerous sports like football, soccer, basketball, and cheer if instructors were held liable for any injury that occurs "while an *instructor* is involved as a coparticipant in the same sport." (Dis. opn., *post*, at pp. 3–4, 5, first italics added.) But the facts of this case involved *no* hands-on instruction such as the examples referenced in dissent; rather, it involved BJJ grappling. We do not dispute *Kahn* "*generally*" bars negligence liability against instructors. (Dis. opn., *post*, at p. 1; *Kahn*, 31 Cal.4th at p. 1011.) It is only in an exceedingly limited category of cases like this one—where an instructor is *not* engaged in active instruction and does something to unreasonably increase the risk of injury to one of their students—that negligence liability applies instead. The "hands-on instruction" cases on which our colleague relies—like the vast majority of sports instructor injury cases—do not fall within these confines. (Dis. opn., *post*, at pp. 3–4, fns. 1–2.)

In sum, the trial court did not err in instructing on option 2 of CACI No. 471 and giving the jury the corresponding verdict form. Given this decision, we need not address Appellants' argument that the increased risk and intentional and reckless standards are not coterminous.

## 2.

We further conclude the trial court did not err in instructing the jury on CACI Nos. 400 and 401. Because the increased risk standard is the sports-specific negligence standard applicable when primary assumption of

32

risk does not bar negligence liability, instructing on negligence was not technically erroneous.

Nonetheless, it was potentially confusing. CACI No. 400 as given essentially duplicated CACI No. 471, replacing CACI No. 471's first two elements—that Iturralde was Greener's instructor and that he "unreasonably increased the risks to [ ] Greener over and above those inherent in Brazilian jiu jitsu sparring"—with the single element that Iturralde "was negligent"—a term not used up to that point before the jury except in reference to a stipulation concerning Greener.

To the extent the two instructions were inconsistent, however, "the more specific charge controls the general charge." (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 878.) Here, option 2 of CACI No. 471 is negligence tailored to the sports context; therefore, it was the more specific instruction, which the jury presumably followed. (*Ibid.*)

But given the potential for confusion and because CACI No. 471 on its own appears not to provide guidance on the applicable standard of care, we suggest the Advisory Committee on Civil Jury Instructions consider proposing a modified version of CACI No. 471. A revised and self-contained CACI No. 471 (1) specifying the standard of care applicable to option 2 of the second element of CACI No. 471 and (2) omitting any cross reference to CACI

No. 400 would assist judges and jurors in their understanding of instructor liability in these cases.[2]

## III.

Finally, we address Appellants' claim that the trial court abused its discretion in excluding from trial certain evidence Appellants contend was necessary to mount an effective defense. Specifically, Appellants challenge the exclusion of (1) cross-examination of Greener as to his experience with grappling sports, including high-school wrestling; (2) a video of Greener in a high-school wrestling match; (3) a video of Greener competing in a BJJ competition; (4) videos of BJJ competitions not involving Greener; (5) testimony from Iturralde about how Greener's desire to compete impacted his approach to training Greener; and (6) testimony of other Club students about the incident and their experience as Iturralde's students.

"Trial court rulings on the admissibility of evidence . . . are generally reviewed for abuse of discretion." (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478.) Even so, any "error in excluding evidence is grounds for reversing a judgment only if the party

---

2      While the court ultimately did not instruct on option 1 for the second element of CACI No. 471, the Committee also may wish to consider modifying that portion of the instruction given the confusion expressed by the court and the parties in this case. CACI No. 470, which instructs on primary assumption of risk for coparticipants, explains: "**Conduct is entirely outside the range of ordinary activity involved in** [*e.g., touch football*] if that conduct (1) increased the risks to [*name of plaintiff*] over and above those inherent in [*e.g., touch football*], and (2) can be prohibited without discouraging vigorous participation or otherwise fundamentally changing the [*sport/activity*]." (Boldface omitted and added.) Because CACI No. 471 uses the exact same bolded phrase, it may be helpful to provide the same definition.

appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480.)

To the extent Appellants take issue with the court's "stated reasons" for exclusion, these arguments are unpersuasive. "[I]f the exclusion of evidence is proper on any theory, the exclusion must be sustained." (*Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1483.)

To the extent Appellants claim excluded items 1, 2, and 3 above were "plainly relevant" to establishing Greener was not a novice, we agree with Greener that such evidence was irrelevant—not "critical," as Appellants urge—given his improper technique theory of liability. We thus need not decide if the trial court erred in (1) finding Iturralde's trial testimony made the evidence as to Greener's skill level irrelevant, (2) allegedly preemptively disallowing impeachment of Greener on his prior experience, or (3) concluding Greener's experience was only relevant to comparative fault, which was not at issue.

Even if relevant, this evidence was cumulative of evidence already before the jury. Cumulative evidence is properly excluded under Evidence Code section 352 when its probative value is substantially outweighed by likely undue consumption of time or confusion.

Both Greener and Rener established Greener had trained in BJJ and competed on and off over a period of years, even winning or placing highly in competitions. Thus, despite Appellants' claims otherwise, Iturralde's assessment of Greener as more skilled than a typical white belt *was* corroborated. As a result, any further evidence of Greener's experience was cumulative and only likely to confuse the jury with tangential matters and extend the already lengthy proceedings. (See, e.g., *Cubic Corp. v. Marty*

(1986) 185 Cal.App.3d 438, 455 [evidence properly excluded as cumulative where jury had already heard evidence on the issue].)

Appellants claim the videos of BJJ competitions not involving Greener (item 4) would provide the jury necessary context to show what Greener was training for and help them appreciate the physicality and risks of BJJ. They further claim testimony from Iturralde about how Greener's desire to compete impacted his approach to training Greener (item 5) was important to understanding whether it was reasonable for Iturralde to perform the second maneuver on him. We, however, agree with Greener these items of evidence were irrelevant and cumulative.

First, while Iturralde testified it was "clear" Greener intended to continue competing, he did not attest to the basis for that understanding. Greener told *Phelps* he intended to keep competing, but there was no evidence Phelps shared that knowledge with *Iturralde*. Although Appellants argue Iturralde's decisions should be evaluated objectively—not based on what he personally knew—the objective determination of how a reasonable instructor would have acted in Iturralde's position should be judged in light of what Iturralde knew at the time he injured Greener. Thus, absent evidence of Iturralde's knowledge that Greener was preparing to compete, this evidence was irrelevant.

Second, Iturralde, Rener, and Clark all testified to the inherent risk of injury in BJJ. They all testified to the general risks of BJJ and the greater intensity of competition over sparring. Clark testified competition was less safe than sparring because one's opponent may move "without any care or regard for your safety." The jury watched a sparring video. Iturralde spoke extensively of his observations of Greener's skill and how that impacted his approach to training him. This evidence gave the jury sufficient context to

appreciate the nature of BJJ generally as well as in competition and what Greener was purportedly training for; any further evidence on this collateral issue was thus cumulative and likely to confuse the jury or prolong trial.

Finally, the other students' testimony (item 6) was also properly excluded. Appellants claim the court erred in declaring this testimony impermissible character evidence under Evidence Code section 1101 because the evidence was relevant and admissible to show (1) the sparring session the day of Greener's injury was normal and there was no bad blood between Greener and Iturralde; and (2) Iturralde had the knowledge and skill to spar safely with students and prioritized safety. Even accepting this offer of proof for purposes of our analysis, we perceive no error because the evidence was cumulative of evidence already before the jury.

The jury heard ample evidence about the sparring session during which Iturralde injured Greener. Appellants' counsel asked the student who testified at trial if "anything out of the ordinary" had happened in class prior to the incident and whether there was "any trash talking" between any students or instructors, but the student confirmed it was a normal day. Greener agreed that, to his recollection, "[t]here was no bad blood or any animosity between [him] and [ ] Iturralde" at the time. Iturralde confirmed there was nothing "unusual" about the day. All these witnesses—including a neutral third party subpoenaed by both sides—corroborated one another. Any further evidence from similarly situated witnesses to the same effect would have been cumulative and further extended an already lengthy trial.

Similarly, the jury heard evidence about Iturralde's skill and safety prioritization. Phelps testified he believed Iturralde "was a safe instructor." He was "pretty excited" to have a person of "Iturralde's caliber" on his staff. The student who testified at trial had no "issues with [Iturralde] . . . as an

37

instructor." Iturralde had never injured him, he did not feel threatened by Iturralde's movements in sparring, and he never felt Iturralde was reckless. Indeed, he described Iturralde's training as "world class." Clark confirmed he hired Iturralde as an instructor at his academy after Greener's injury, implying Clark believed Iturralde to be a knowledgeable and safe instructor despite the incident. Clark also corroborated Iturralde's claim that the maneuver he used was common and inferentially not overly risky. Iturralde was clear his students' safety was his top priority. Thus, any additional testimony as to Iturralde's skill and safety prioritization also was cumulative and trial prolonging.

Accordingly, we conclude the trial court did not abuse its discretion in excluding the identified evidence.

## DISPOSITION

We affirm the judgment. Appellants shall pay Greener's costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


CASTILLO, J.

I CONCUR:


KELETY, J.

38

IRION, Acting P. J., Dissenting.

As I understand my colleagues' opinion, they would apply the primary assumption of the risk doctrine in lawsuits against sport instructors only when an instructor's injury-producing conduct falls into the two specific categories described in *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 (*Kahn*). Specifically, the majority would apply the doctrine in "cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student." (*Id.* at p. 996.) However, when those two specific categories are not implicated, such as where, as here, an instructor causes an injury during hands-on instruction through coparticipation in the core activity of the sport, the majority would apply a negligence-based duty of care. My colleagues reach this conclusion even though *Kahn* expressly states that "we believe that the standard set forth in [*Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*)], as it applies to coparticipants, *generally* should apply to sports instructors." (*Kahn*, at p. 1011, italics added.) In my view, the majority's approach is unsound because it defines a sport instructor's duty of care in a manner that chills hands-on instruction through coparticipation in inherently dangerous sports, even though such instruction may be crucial in teaching students to perform safely and avoid injury to themselves and others.

As first explained in *Knight, supra,* 3 Cal.4th 296, and subsequently reaffirmed by our Supreme Court, "sports participants have a limited duty of care to their coparticipants, breached only if they intentionally injure them or 'engage[ ] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.' [Citation.] This application of

the primary assumption of risk doctrine recognizes that by choosing to participate, individuals assume that level of risk inherent in the sport." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 486, italics omitted (*Shin*), quoting *Knight*, at p. 320.)

In *Kahn*, our Supreme Court concluded that "the standard set forth in *Knight* . . . , as it applies to coparticipants, generally should apply to sports instructors, keeping in mind, of course, that different facts are of significance in each setting." (*Kahn*, *supra*, 31 Cal.4th at p. 1011.) After making that general statement, *Kahn* turned to the specific fact pattern before it, in which the "defendant coach directed plaintiff (a novice on the swim team) to perform a shallow racing dive in competition without providing any instruction, . . . ignored her overwhelming fears and made a last-minute demand that she dive during competition, in breach of a previous promise that she would not be required to dive." (*Id.* at p. 1013.) Summarized more simply, the coach was alleged to be liable for injuries caused by inadequate instruction and requiring the student to perform beyond her abilities. Addressing those allegations, *Kahn* held that "[i]n order to support a cause of action in cases in which it is alleged that a sports instructor has required a student to perform beyond the student's capacity or without providing adequate instruction, it must be alleged and proved that the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's conduct was 'totally outside the range of the ordinary activity' . . . involved in teaching or coaching the sport." (*Id.* at p. 1011.)

However, because the issue was not presented, *Kahn* did not directly address whether the primary assumption of the risk doctrine *also* applies when a coach in an inherently dangerous sport is the *direct physical cause* of a student's injury due to the coach's hands-on instruction through

coparticipation. That is the situation presented by this case. Iturralde caused Greener's injury through his own direct physical action during sparring, which is a core activity of Brazilian Jiu Jitsu, an inherently dangerous sport.

The majority concludes that *Knight*'s intentional/reckless standard is not applicable when an instructor causes an injury during hands-on instruction through coparticipation. As my colleagues explain, "Here, Greener was not injured due to a move *he* was challenged or directed to perform; instead, he was injured by his *instructor's* unilateral choices to immobilize him and apply moves which now unacceptably increased the risk of injury to him. These facts distinguish this case from *Kahn*, where the instructor forced the *student* to perform a skill without training." (Maj. opn., *ante*, p. 28.) The majority summarizes its holding by explaining that "as an instructor with superior knowledge and skill of [Brazilian Jiu Jitsu], Iturralde was differently situated from other students, and thus he can—and we conclude should—be held to a different standard." (Maj. opn., *ante*, p. 3.)

According to my colleagues, their opinion will have only a narrow practical impact. They believe that the standard set forth in *Kahn* will "continue[ ] to apply to the vast majority of cases in which a sports instructor is alleged to have injured a student." (Maj. opn., *ante*, p. 4.) However, that assumption about the opinion's likely impact fundamentally misapprehends an instructor's role in teaching many common sports. Consider other inherently dangerous sports where the instructor delivers hands-on instruction by coparticipating in a sport: a football or soccer coach performs a tackle in a manner that injures a student;[1] a basketball coach inadvertently

---

1     Case law discusses similar situations. (*Koffman v. Garnett* (Va. 2003) 574 S.E.2d 258, 260 [where a football coach injured a student during a

3

hits a student's head with a ball during a drill;[2] a cheerleading coach causes injury to a student while demonstrating a launch or a catch. In each of those examples, as here, the risk of injury is inherent in the instructor's participation. It is understood that a tackle, a basketball drill, or a cheerleading stunt can be improperly executed, leading to injury, just like a poorly executed move in a martial art such as Brazilian Jiu Jitsu. Further, under *Knight*, *supra*, 3 Cal.4th 296 and subsequent cases involving sports coparticipants (*Shin*, *supra*, 42 Cal.4th 482; *Cheong v. Antablin* (1997) 16 Cal.4th 1063) there is no doubt that our Supreme Court would apply the primary assumption of the risk doctrine if a *coparticipant* in any of those activities was in the position of the instructor. Therefore, a coparticipant who executes a tackle in football or soccer, hits another player's head with a ball in basketball, or performs a launch or catch in cheerleading would be liable for any resulting injury only if that coparticipant "intentionally injure[d]" the other person or "engage[d] in conduct that [was] so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight*, at

tackling demonstration, the court observed that "receiving an injury while participating in a tackling demonstration may be part of the sport"]; *Maselli v. Reg'l Sch. Dist. No. 10* (Conn. Ct.App. 2020) 235 A.3d 599, 605 [a coach participating in a soccer scrimmage injured a student when kicking a ball toward her]; *Behar v. Fox* (Mich. Ct.App. 2001) 642 N.W.2d 426, 428–429 [claims for injuries resulting when a soccer coach "either collided with or kicked the boy in the knee during a soccer scrimmage" were subject to the "reckless misconduct" standard, observing that the coach "was as much a 'coparticipant' in the scrimmage as he was a coach"].)

2    See *In re C.G. Minor,* (Ind. Ct.App. 2020) 157 N.E.3d 543, 548 [when a high school basketball coach, engaged in a layup drill, blocked a ball that struck a student's head and caused a concussion, there was no breach of duty as a matter of law unless the coach's actions were intentional or reckless because he was "a sports participant engaging in conduct that was ordinary in the sport"].

4

p. 320.) But under the majority's approach, in any of those instances, if an injury occurs while an *instructor* is involved as a coparticipant in the same sport, the primary assumption of the risk doctrine does *not* apply, and the instructor will be liable for an injury resulting from a negligently performed move.

That cannot, and should not, be the law. The existence and scope of duty is a question of law for the court, based on policy considerations. (*Shin, supra,* 42 Cal.4th at p. 488 [because "[t]he existence of a duty is . . . an expression of policy considerations providing legal protection" "the existence and scope of a defendant's duty is a question for the court's resolution"].) The policy behind our Supreme Court's decision in *Kahn* was to avoid "a chilling effect on the enterprise of teaching and learning skills that are necessary" to an inherently dangerous sport. (*Kahn, supra,* 31 Cal.4th at p. 1007.) *Kahn* expressly refused to define a sport instructor's duty of care "in terms that would *inhibit adequate instruction and learning* or eventually alter the nature of the sport." (*Id*. at p. 1011, italics added.) It is common knowledge that instruction in many sports will at some point benefit from hands-on instruction in the form of coparticipation by an instructor. Indeed, the evidence at trial showed that is the case with sparring in Brazilian Jiu Jitsu.[3] Moreover, comprehensive instruction is *especially* important in

---

[3]    Defendants' expert Clark Gracie testified, "[T]here are so many techniques to learn, that a lot of the techniques, you end up passing to your students or passing from student to student during the sparring session. A lot of it is a -- based on feeling and energy and movement. . . . So a lot of the moves that I teach my students, I believe are actually best learned in a sparring situation because they feel the energy behind it. They learn to defend it. They learn to anticipate the movements. So we learn a lot in sparring." He explained, "There are moves -- alternate moves, alternate versions, variations of these techniques that we will experience in sparring

inherently dangerous sports to ensure that students learn how to safely participate so they do not injure themselves or others. If an ordinary negligence-based standard applies to hands-on instruction in an inherently dangerous sport, the scope of instruction in those sports will suffer. Put simply, the majority's approach is unsound, and cannot be what our Supreme Court intended in *Kahn* because, by imposing a negligence-based standard of liability for injuries that occur when an instructor directly participates while teaching an inherently dangerous sport, instructors will be discouraged from such instruction, even when that type of instruction is an important and necessary teaching tool.

My colleagues contend that a negligence-based standard should apply to injuries incurred during an instructor's coparticipation by observing that "[i]t is not an inherent risk of [Brazilian Jiu Jitsu] sparring that an instructor will perform a maneuver on a student knowing the student will be injured." (Maj. opn., *ante*, p. 29.) However, that indisputable proposition is adequately addressed by the standard set forth in *Kahn*. An instructor who performs a maneuver on a student knowing that the student will be injured will easily be found to have "acted with intent to cause a student's injury or . . . acted recklessly in the sense that the instructor's conduct was 'totally outside the range of the ordinary activity' . . . involved in teaching or coaching the sport." (*Kahn*, *supra*, 31 Cal.4th at p. 1011.) I agree with my colleague's observation that "there is a difference between 'a master of the art' who is 'the instructor of the class' engaging with a student on the one hand and a student interacting with another student on the other." (Maj. opn., *ante*, p. 31.) However, there is no need to apply a negligence-based standard to take into

---

that will be very hard to teach everything with only doing a technique demonstration form of learning."

account an instructor's increased level of skill. The instructor's skill level and expertise will necessarily be part of a jury's assessment of whether the instructor acted recklessly under the standard set forth in *Kahn*. A novice coparticipant who improperly performs the same move that injured Greener might be found to have acted only carelessly. Conversely, an expert instructor like Iturralde who performs the same move in an improper manner could easily be found to have acted recklessly, outside the bounds of normal teaching.

In sum, because the majority's approach would have a chilling effect on hands-on instruction in inherently dangerous sports, I respectfully dissent. The trial court erred because it instructed the jury with a negligence-based standard instead of instructing with the standard adopted in *Kahn*. The jury should have been instructed on the concept that Iturralde was liable if he "acted with intent to cause a student's injury or . . . acted recklessly in the sense that [his] conduct was 'totally outside the range of the ordinary activity' . . . involved in teaching or coaching the sport." (*Kahn*, *supra*, 31 Cal.4th at p. 1011.)

As a final matter, I note that the majority urges the Advisory Committee on Civil Jury Instructions to consider revisions to CACI No. 471. After reviewing CACI Nos. 470, 471 and 472, and noting the parties' and the trial court's justified confusion about how those three instructions could be harmonized with each other in this case, I share the view that the jury instructions on primary assumption of the risk warrant a close review by the Advisory Committee. Moreover, some of the confusion may emanate from the case law itself.

A close analysis of our state's case law on the primary assumption of the risk doctrine shows that courts are not uniform in their understanding of

7

the doctrine. The law review article cited by the majority comprehensively sets forth the state of the divergent case law as of its writing in 2011. (Hnylka, *California Drops the Ball: The Lack of A Clear Approach to Recklessness in Sport Injury Litigation* (2011) 11 Va. Sports & Ent. L.J. 77.) One fundamental point of persistent confusion in the case law involves the intersection of the two legal standards first set forth in *Knight* and then applied to sport instructors in *Kahn*. Confusion exists as to whether the duty "not to increase the risks to a participant over and above those inherent in the sport" is the same as, or different from, the duty to refrain from "intentionally injur[ing] another player or engag[ing] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight*, *supra*, 3 Cal.4th at pp. 316, 320; see *Bjork v. Mason* (2000) 77 Cal.App.4th 544, 552–554 & fn. 4 [describing confusion caused by *Knight*'s discussion]; Hnylka, at pp. 114–120 [describing confusion in the case law].) This issue seems to have been resolved one way in CACI No. 470 for coparticipants, and in a different way in CACI No. 471 for sport instructors. CACI No. 470 treats a defendant's conduct that increases the risks over and above those inherent in the activity as part of the definition of *recklessness*. In contrast, the Directions for Use in CACI No. 471 describe the defendant's conduct that increases the risks over and above those inherent in the activity as a *negligence-based* standard. Moreover, I note that CACI No. 472, which applies the primary assumption of the risk doctrine to injuries caused by facility owners and operators, is *unclear* on whether it intends a negligence-based standard or a recklessness-based standard in asking the jury to decide whether the defendant "unreasonably increased the risks to [*name of plaintiff*] over and above those inherent in" the activity. (CACI No. 472.) These disparities exist even though our Supreme Court has indicated, at

8

least in dicta, that the same basic primary assumption of the risk standard applies, in general, to *all three* categories.  (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154 ["Where the [primary assumption of the risk] doctrine applies to a recreational activity, operators, instructors and participants in the activity owe other participants only the duty not to act so as to *increase* the risk of injury over that inherent in the activity."].)

In my view, this complexity illustrates that both litigants and trial courts in cases involving the doctrine of primary assumption of the risk would benefit from further attention to that area of the law from both the Advisory Committee and from our Supreme Court.


IRION, Acting P. J.

9